[Nos. 39797, 39958, 40515.     Department Two.     May 8, 1969.]

THE STATE OF WASHINGTON, *Respondent,* v. CLEMON BLANCHEY, JR., *Appellant.*

*In re* CLEMON BLANCHEY, JR., *Petitioner,* v. JACK D. PORTER, *as Sheriff of King County, Respondent.**

*Reported in 454 P.2d 841.

928

*David L. Scott,* for appellant (appointed counsel for appeal).

*Charles O. Carroll* and *Jerry Brian Riess,* for respondent.

NEILL, J.—Defendant was charged with second degree murder. He appeals from a conviction of the lesser included offense of manslaughter.

On the morning of March 20, 1967, defendant was released from the King County jail under the county's work release program. He reported to work and later in the morning received permission from his employer to leave the job to attend an employment interview. After the interview, he went to the apartment of Leontyne Barbara Gray and accompanied her to the home of her sister. Defendant then went back to work. He returned to the sister's home about 3:45 p.m. and took Mrs. Gray back to her apartment. About 6:30 p.m., Mrs. Gray's husband arrived home from work and found her body in the apartment. She had been shot through the head. A .45 caliber revolver belonging to the victim, as well as her wallet, money, and various papers were missing from the apartment. A week later defendant was charged with second degree murder in a Seattle district justice court.

The victim's wallet was found on a Cle Elum street on the evening of March 20th. On March 27th, defendant's car was found abandoned in Dryden, Ontario. Later that same day, police officials in Pembroke, Ontario, received a telex message advising that defendant was wanted in Seattle and was believed to be aboard a passenger train due to arrive at Pembroke at 5:09 p.m. Pembroke police officers met the train when it arrived and arrested defendant. The victim's revolver was there found in defendant's suitcase.

That evening, prior to any interrogation of defendant, the Pembroke authorities received a telephone call from the King County prosecutor's office and, acting pursuant to the instructions of the caller, advised defendant of his constitutional rights. Defendant apparently concedes that this warning fully satisfied the requirements of *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966).

Defendant requested counsel and a Canadian solicitor was appointed to represent him. After a 2-hour conference with this solicitor, defendant gave the Pembroke authorities a signed, prepared statement which was admitted at trial without objection.[1]

On March 31st, two detectives from the Seattle Police Department took defendant into custody from the Pembroke police at the Canadian-New York border. From there they drove by car to Watertown, New York, where they boarded a plane to New York City, changed planes and flew to Seattle. During this trip the detectives discussed Mrs. Gray's death with defendant and obtained his version of the shooting. These statements were consistent with his previous written statement that the shooting was accidental, but did add information as to defendant's illicit relationship with the decedent. Prior to discussing this matter, defendant was again warned of his constitutional rights, although the detectives testified that their warnings were more or less woven into the conversation. The statements made by defendant to the detectives during this trip, determined to be voluntary by the trial court at a pretrial CrR 101.20W hearing, were admitted into evidence over objection.

Defendant's assignments of error bring into issue the admission of the conversations between defendant and the police officers during this trip to Seattle. Error is also assigned to the introduction of testimony concerning defendant's participation in the work release program and his failure to return to jail the night of Mrs. Gray's death.

Defendant first argues that his request for an attorney while in custody in Canada was an exercise of his Fifth and Sixth Amendment rights which cuts off all subsequent interrogation. In support of this position, he cites the following language from *Miranda v. Arizona*, 384 U.S. at 473-4:

[1]The statement recites: "The whole incident was an accident. I loved Tina very much. I became very excited and emotionally upset and left without fully recognizing what I should do, or what had happened. This is a true statement given voluntarily and without any threats or promises."

Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked. If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent.

(Footnote omitted.)

It cannot be disputed that an accused has an absolute right to remain silent, and that the police are bound not to physically abuse, browbeat, cajole or otherwise pressure an accused in an attempt to get him to relinquish this right. As stated in *Jennings v. United States*, 391 F.2d 512, 515 (5th Cir. 1968):

[W]hat the Court sought to interdict in *Miranda* were those situations in which a person has indicated his desire to exercise his constitutional right of silence but the police refuse to take "no" for an answer.

■ Defendant exercised his right to consult an attorney before answering any questions. After consultation with an attorney, defendant gave the signed statement to the authorities. The Canadian authorities did not attempt further interrogation. Even though an accused expresses a desire for counsel and questioning has ceased (as it must) until counsel is provided, an accused may thereafter consent to be questioned. *See Coughlan v. United States*, 391 F.2d 371 (9th Cir. 1968). This was expressly recognized by the Supreme Court in *Miranda*, 384 U.S. at 445:

> The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney *and thereafter consents to be questioned.*

(Italics ours.) Therefore, we hold that police are not barred from further interrogation of an accused merely because he requested counsel, provided such further interrogation occurs after the accused has been given the opportunity to consult with appointed counsel.[2]

Defendant next contends that he was not properly advised of his rights prior to the conversations with the Seattle detectives. The defendant was properly warned shortly after his apprehension in Canada. He was again advised of his rights 4 days later by the Seattle detectives although these admonitions were woven into the conversation among the parties. In response to the latter warnings, defendant indicated that he was aware of his rights, having been advised of them by the Canadian authorities.

We need not reach the question of whether the warnings given by the Seattle detectives were defective because they were woven into the conversation or whether, as the state contends, there is a rule of "substantial compliance" for Miranda warnings. Rather, it is undisputed that defendant was properly advised of his rights while in Canada and was still aware of these rights 4 days later at the beginning of the trip back to Seattle. Defendant under these circumstances was adequately and effectively apprised of his rights. *See Maguire v. United States,* 396 F.2d 327 (9th Cir. 1968).

Defendant also argues that it is meaningless to advise him of his right to counsel at the beginning of a long plane trip when counsel is obviously not available, and that his

---

[2]The Canadian solicitor was obviously not appointed to represent defendant after he left Canada; so we are not here dealing with a situation in which a person represented by counsel is interrogated without his counsel's knowledge. This is grounds for excluding the resultant statements in some jurisdictions. (*See People v. Vella,* 21 N.Y.2d 249, 287 N.Y.S.2d 369, 234 N.E.2d 422 (1967).)

failure to request counsel cannot be construed as a waiver of his right to have counsel present during questioning.

■■ When an accused is properly advised that he has a right to counsel before and during police interrogation and that he has a right to remain silent, there is no requirement that the advice of right to counsel be accompanied by a present ability to provide counsel. This same conclusion was reached by the court in *Mayzak v. United States*, 402 F.2d 152, 155 (5th Cir. 1968):

> There is no doubt that Mayzak was warned of his right to have court appointed counsel and to have such counsel present prior to and during any questioning. Rather we are asked to find that the sufficiency of a Miranda warning is diluted or destroyed because the promise of an attorney is not accompanied by a concurrent tender of one. To so hold would be to allow a defendant to use his right to an attorney as a weapon against his custodians. He would simply argue if you will not furnish me an attorney now, even though I am told that I can remain silent, I will talk and after talking object to my words going into evidence. This argument is both hollow and specious. The Miranda warnings given to Mayzak were constitutionally adequate. That he chose of his own free will to speak without the assistance of counsel should give him no cause for complaint.

To hold otherwise would require the police to maintain lawyers in patrol cars, precinct headquarters, and all other places where a suspect might be advised of his right to counsel. Such a course is not necessary to insure the constitutional rights of an accused. Defendant was fully advised of his right to remain silent and of his right to counsel. If defendant had wished to remain silent until another lawyer could be appointed to represent him, all he needed to do was say so, and the detectives would have been bound to stop their questioning. Therefore, the inability of the detectives to procure counsel while in transit to Seattle does not preclude the possibility that defendant may have waived his right to counsel.

■ Has the state sustained its heavy burden of showing the defendant knowingly and intelligently waived his priv-

ilege against self-incrimination and his right to counsel? *See State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968); *Miranda v. Arizona, supra. Miranda* contains the following discussion of the quantum of evidence necessary to establish a waiver of Fifth and Sixth Amendment rights at 475:

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley v. Cochran,* 369 U.S. 506, 516 (1962), is applicable here:
>
> > "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

Justice Harlan, dissenting in *Miranda,* assumes that this requires an "express" or affirmative waiver by an accused. However, this result is not required by the above language from *Miranda. Miranda* prohibits a presumption of waiver merely from a warning followed by a confession or admission, but such a waiver may be established by the evidence without an express waiver by the accused. *See Bond v. United States,* 397 F.2d 162 (10th Cir. 1968); *United States v. Hayes,* 385 F.2d 375 (4th Cir. 1967). We agree with the conclusion announced in *United States v. Hayes,* 385 F.2d at 377-78:

> Thus, we cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof.

Rather than contending that an express waiver was required, defendant argues that the facts do not clearly and

convincingly show a knowing and intelligent waiver. Defendant testified at the pretrial hearing that his statements to the detectives were voluntary; however, there is a difference between a voluntary admission and a knowing waiver. An accused may make an admission voluntarily, *i.e.*, without physical or psychological coercion, while not making an intelligent and understanding decision to forego his right to counsel or his right to remain silent.

■ Defendant places heavy reliance upon the facts that he was not handcuffed on the airplane trip, the detectives spoke to him in friendly, conversational tones, and did not take notes of his answers. Defendant claims that this behavior amounts to cajolery which shows that he did not waive his right. *See Miranda v. Arizona*, 384 U.S. at 476:

> Moreover, any evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege.

In *State v. Davis*, 73 Wn.2d at 282, we defined "cajolery" as follows:

> "Cajolery" may be defined as a deliberate attempt at persuading or deceiving the accused, with false promises, inducements or information, into relinquishing his rights and responding to questions posed by law enforcement officers.

Here there were no false promises, inducements or information given by the detectives. Defendant was fully aware who the detectives were, what he was charged with; and that his statements might be used against him. The detectives did not do or say anything necessarily inconsistent with these facts. Under these circumstances, we cannot say defendant was tricked or cajoled into making his statements.

The question remains whether these facts show there was a knowing and intelligent waiver. If there is substantial evidence that defendant did not in fact realize that the detectives could use these statements against him, then he did not make a knowing decision to waive his rights regardless of the "voluntariness" of his statements. Of course

it is impossible to establish conclusively what was going through defendant's mind at the time he spoke to the detectives. All that *Miranda* requires is evidence which shows, and which satisfies a heavy burden of proof, that defendant was aware of his rights and made a conscious decision to forego them. Here there is strong evidence that defendant completely understood his rights at the beginning of the trip back to Seattle. Defendant himself testified that he told the Seattle detectives that he was familiar with his rights. He had been warned twice and had demonstrated his understanding of his rights by exercising them while in custody in Canada. This previous exercise of his rights lends strong support to the conclusion that his subsequent statements were the result of a conscious decision to waive these rights. *See United States v. Hayes, supra.*

Against this evidence of waiver we have evidence only that the officers were friendly to defendant—which defendant claims misled him into making statements. The recent history of judicial decisions in the confession area has been dominated by attempts to free accused persons from the effects of the inherently coercive atmosphere of a police interrogation. It would reduce our system of criminal justice to a theater of the absurd to turn around and say that when this coercive atmosphere is not present a confession is still invalid because defendant was misled by the friendliness of the interrogating officers.

There is the further, persuasive fact that the information given by the defendant to the detectives compares with and is, in substance, a detailed reiteration of the written statement given to the Pembroke officer. In fact, it is obvious that the jury accepted defendant's version of the incident —that it was an accidental killing—by its verdict of manslaughter.

We hold that the state has satisfied its heavy burden of proof that defendant's statements were the product of a knowing and intelligent waiver.

During the pretrial hearing, defense counsel asked one of the detectives what they would have done if defend-

ant had requested counsel during the trip. An objection to this question was sustained. Defendant assigns error to this ruling. Although the detectives would have been required to cease questioning the defendant if he had asked for counsel, since he did not make such a request, what the detective would have done is speculative. This question is irrelevant. The trial court properly sustained the objection.

■ Defendant also assigns error to the failure of the trial court to enter findings of fact and conclusions of law as to whether defendant waived his constitutional rights. CrR 101.20W(c) requires the trial court to set forth (1) the undisputed facts; (2) the disputed facts; (3) his conclusions as to the disputed facts; and (4) his conclusions as to whether the confession was voluntary and admissible. The trial court met these requirements. To the extent that *Miranda* requires more than a showing of voluntariness for a confession to be admitted, we may assume the trial court had considered these matters when determining the confession to be admissible—particularly when a knowing and intelligent waiver is supported by the trial court's findings of fact.

■ The second general issue raised by defendant's assignments of error concerns the testimony about defendant's participation in the work release program and his failure to return to jail the night of the victim's death. Defendant claims this testimony amounted to evidence of unrelated crimes which was prejudicial and reversible error. The state contends that this was properly admitted as evidence of flight. In *State v. Bruton*, 66 Wn.2d 111, 112, 401 P.2d 340 (1965), we considered the scope and rationale behind the admission of evidence of flight:

> It is an accepted rule that evidence of the flight of a person, following the commission of a crime, is admissible and may be considered by the jury as a circumstance, along with other circumstances of the case, in determining guilt or innocence. The rationale of the principle is that flight is an instinctive or impulsive reaction to a consciousness of guilt or is a deliberate attempt to avoid arrest and prosecution. [Citations omitted.]

The law makes no nice or refined distinctions as to·the manner or mode of flight, and the range of circumstances which may be shown as evidence of flight is broad.

Generally, a man can only be tried for the charge named in the indictment and introduction of evidence of unrelated crimes is improper and· unconstitutional. However, evidence which tends incidentally to show that the accused has committed another offense will be admitted where competent, relevant, and material to an issue to be determined by the jury. *See State v. Coe,* 34 Wn.2d 336, 208 P.2d 863 (1949); *State v. Vindhurst,* 63 Wn.2d 607, 388 P.2d 552 (1964); *State v. Morris,* 70 Wn.2d 27, 422 P.2d 27 (1966); *Fernandez v. United States,* 329 F.2d 899 (9th Cir. 1964). The fact that defendant did not return to jail the night the victim's body was found certainly is relevant to the question to be decided by the jury. This relevance is not obscured by the incidental effect that this evidence also showed that defendant was already serving a term for another offense. The evidence in question was properly admitted.

Since defendant's motion for a new trial was predicated upon the issues discussed above, the trial court did not commit error in denying the motion.

In addition to the brief filed by defense counsel, defendant has filed a pro se brief. Although this brief does not comply with ROA 42 and 43, we have reviewed the issues raised therein and find no reversible error.

Defendant has also filed three pro se petitions for writs of habeas corpus in which issues are·raised that we now consider.

■ First, defendant claims that the justice court had no jurisdiction to issue a· warrant for his arrest. Superior courts have ·original jurisdiction in all criminal cases amounting to a felony. Const. art. 4, § 6; RCW 2.08.010. However, authority to issue warrants in·these cases is granted to justice· courts by RCW 10.16.010. Under this statute the warrant still must be issued upon a finding of probable cause and the accused in felony cases must be

938

bound over to superior court for trial. *State v. Wright,* 51 Wn.2d 606, 320 P.2d 646 (1958). With these requirements we find no constitutional defect in our statute allowing justice courts to issue warrants in cases involving a felony. *See Draper v. Rhay,* 242 F. Supp. 829 (E.D. Wash. 1964).

■ Defendant also claims he was arrested before the warrant for his arrest was issued. The record does not disclose when the warrant issued. However, we need not review the record for evidence of probable cause. Defendant was personally present before the court and pleaded not guilty. Under these circumstances, the court had jurisdiction over his person regardless of the validity of his arrest, and no constitutional right is violated by his subsequent trial. *State v. Ryan,* 48 Wn.2d 304, 293 P.2d 399 (1956); *Ollison v. Rhay,* 68 Wn.2d 137, 412 P.2d 111 (1966); *Frisbie v. Collins,* 342 U. S. 519, 96 L. Ed. 541, 72 S. Ct. 509 (1952).

■ Defendant states that, prior to his trial, he personally filed a motion to set aside the information, and a "motion for legal documents." From our review of the record, we can find no indication that these motions were either filed or ruled upon. It would certainly be unfortunate if, as defendant claims, these motions were filed and ignored by the court. However, defendant was represented by capable counsel at the time he supposedly filed these pro se motions. A person who chooses to be represented by counsel has no constitutional right to personally conduct his defense. *See People v. Mattson,* 51 Cal. 2d 777, 336 P.2d 937 (1959). Although the trial court should make every effort to hear such motions, defendant was deprived of no constitutional right by the court's failure to hear a pro se motion when defendant was adequately represented by counsel.

■ Defendant also claims that he was deprived of his rights by the failure of his appointed counsel to aid him in the preparation of the above motions. Defendant requested counsel and did not choose to conduct his own defense. Defendant has no constitutional right to utilize appointed counsel merely as a procedural advisor; rather, appointed

counsel will be allowed reasonable latitude in making the tactical decisions necessary for the preparation of a defendant's case. *See State v. Graeber,* 46 Wn.2d 602, 283 P.2d 974 (1955); *People v. Jackson,* 186 Cal. App. 2d 307, 8 Cal. Rptr. 849 (1960).

Defendant also argues his right to petition for habeas corpus was abridged. Defendant originally submitted a petition for habeas corpus to the trial court. He withdrew it on the first day of trial. Later during the trial he asked the court to reinstate his petition. This request was denied. If any error was committed by this denial, it is certainly harmless, because we are now considering three petitions for habeas corpus submitted by defendant in which the issues submitted in the original petition are or could be raised.

Defendant finally contends that RCW 9.48.060, fixing the penalty for manslaughter, violates the equal protection clause of the Fourteenth Amendment because it provides for imprisonment for 20 years in the state penitentiary, or imprisonment for no more than 1 year in the county jail, or a fine, or punishment by both fine and imprisonment. We have held that statutes which give the prosecution discretion to charge either a felony or a misdemeanor upon the same facts violate the equal protection clause. *Olsen v. Delmore,* 48 Wn.2d 545, 295 P.2d 324 (1956). However, statutes worded as the one here charge only a felony and allow variation only in punishment—as such they do not violate the equal protection clause. *See State v. Boggs,* 57 Wn.2d 484, 358 P.2d 124 (1961), where statutes allowing anything from a one cent fine to life imprisonment for the same crime were upheld. *See also, State v. Saylors,* 70 Wn.2d 7, 422 P.2d 477 (1966); *State v. Harvey,* 57 Wn.2d 295, 356 P.2d 726 (1960); *Daloia v. Rhay,* 252 F.2d 768 (9th Cir. 1958); *Smith v. Rhay,* 254 F.2d 306 (9th Cir. 1958). This distinction between discretion in choosing the degree of the charge and discretion in fixing the sentence may seem pointless and can result in petty disputes over language. *See Olsen v. Delmore, supra.* How-

ever, it results from a meeting of our two goals of treating all men equally in the guilt determination process while retaining some flexibility and individualized treatment at the punishment stage. Until a better way of reflecting these two goals can be found, we will abide by the above distinction.

Defendant also makes a number of additional contentions which we shall not set forth here. Suffice it to say that we have reviewed them all and find no grounds to grant the petitions for writs of habeas corpus.

Judgment affirmed.

HUNTER, C. J., HILL and HAMILTON, JJ., and OTT, J. Pro Tem., concur.