Carolee BIDDY, Petitioner-Appellant,

v.

Fred DIAMOND, Sheriff, Jackson County Jail, and Jack Reed, Warden, Mississippi Penitentiary, Respondents-Appellees.

No. 74–2385.

United States Court of Appeals, Fifth Circuit.

July 18, 1975.

Rehearing Denied Sept. 8, 1975.

Harry L. Kelley, Jackson, Miss., F. Lee Bailey, Mark J. Kadish, Boston, Mass., John R. Poole, Jackson, Miss., for petitioner-appellant.

A. F. Summer, Atty. Gen., Timmie Hancock, Karen Gilfoy, Asst. Attys. Gen., Jackson, Miss., for respondents-appellees.

Before GOLDBERG and RONEY, Circuit Judges, and GROOMS, District Judge.

RONEY, Circuit Judge:

Petitioner, Carolee Biddy, was convicted in a Mississippi state court of manslaughter of her six-year old stepdaugh-

ter. The facts of the case are recited in some detail in the opinions of the Supreme Court of Mississippi affirming the conviction and denying the petition for rehearing at Biddy v. State, 277 So.2d 115 (Miss.1973).

From the denial of a petition for writ of habeas corpus, after a full evidentiary hearing, petitioner presents essentially two appeal issues: first, whether admissions and conduct of appellant, used against her at the trial, were induced by the police in violation of her *Miranda* rights, and her constitutional rights not to testify against herself and to have effective assistance of counsel; and second, whether petitioner's constitutional right to due process was violated by alleged prosecutorial suppression of evidence, four photographs which were withheld by the state from discovery but which were introduced at trial. Finding no error, we affirm.

We are at once met with confusion as to the facts of the case because of the failure of the district court to resolve some apparent conflicts in the evidence and to reflect in its opinion specific facts which the appellant indicates to be critical to the success of her petition. We have made a thorough review of the state court record, the testimony before the district court, and the extensive briefs and oral argument, however; and have concluded that, even with the inadequacy of the district court's opinion, the court cannot be held to be clearly erroneous as to the controlling facts, and that it was not in error as a matter of law in denying the petition for writ of habeas corpus. In other words, we have approached this case from the standpoint of whether, assuming the facts to be as oriented by the appellant but without the conclusory or judgmental overlay given them in appellant's brief, there is any base upon which to reverse the district court's refusal to grant the petitioner relief from the state court conviction.

A brief outline of the facts of the case will furnish sufficient base for an explanation of our decision. A full recitation as to all the details of the case would serve no useful purpose.

Early on the morning of December 3, 1970, petitioner called the Jackson Police Department to report the disappearance of Mona Biddy, her six-year old, mentally retarded stepdaughter. An extensive search for the child was conducted by the police, which eventually involved various other law enforcement officers of surrounding counties, three or four hundred National Guardsmen, and many volunteer civilians. On December 8, five days after her reported disappearance, Mona's body was found on the water's edge at a reservoir, about thirteen miles from the Biddy residence.

Wesley Reeves and Harry Price, the detectives assigned by the Jackson Police Department to conduct the investigation into Mona's disappearance, were in close contact with the Biddy family during the following weeks. On December 15, petitioner agreed to accompany these officers to police headquarters in order to identify an item of clothing apparently worn by Mona at the time of her disappearance. After the clothing had been identified, petitioner was asked if she would be willing to talk to the detectives about the details of Mona's disappearance. She agreed to do so and was taken to a conference room, accompanied by Reeves, Price, and a county attorney named Tom Zebert. She was then advised of her *Miranda* rights (Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)), and signed a written waiver indicating that she understood those rights. Reeves, Price, and Zebert each testified that they were convinced that she understood her rights and that her waiver was voluntary. In response to questioning on this occasion, she denied any involvement in Mona's disappearance.

Later that day, prior to taking a polygraph test, petitioner was again advised of her rights and she signed a second waiver form. She further evidenced her understanding of her rights by asking for "her lawyer" during the administering of the polygraph test. Upon that request, the test was halted and petitioner was questioned no further. That evening Detectives Reeves and Price

stopped by the Biddy home and were advised by an attorney-friend of the Biddys, Charles Wright, that this was neither the time nor place for further questioning of petitioner. Accordingly, they departed without talking to Mrs. Biddy about Mona's disappearance.

During the next ten days, although the detectives did not further pursue questioning petitioner about Mona's disappearance, they were, on at least two occasions, called to the Biddy residence to investigate rather bizarre incidents involving petitioner and her family. On the evening of December 16, they investigated a report that Mrs. Biddy had been attacked and stabbed in the hip by an unknown assailant. They received another call from the Biddy home on the night of December 26. It was reported that petitioner's two and one-half year old daughter, Candice, had been abducted. By the time the detectives arrived at the Biddy residence, the child had been found by Mr. Biddy near a ditch in the backyard. The detectives found little evidence to bear out petitioner's story regarding each incident and concluded that Mrs. Biddy's accounts were "illogical." Mrs. Biddy later admitted that she staged both incidents.

On December 27, the Biddys were asked to come to police headquarters before they left on a trip to Georgia to visit Mr. Biddy's parents. Before leaving their house, and in the presence of the police officers, Mr. Biddy asked his business partner, Mal Sims, to call their attorney, Charles Wright, and ask him to meet them at the police station. Sims complied with the request.

At the police station, the detectives separated the two and talked with Mr. Biddy about several things that petitioner had told them, which they considered to be untrue. About this time Attorney Wright arrived and stated that he was ill and would summon another attorney. While Mr. Biddy was talking to the attorney, the detectives indicated they might want to question Mrs. Biddy and asked her, "Do you understand your rights?" To this she responded that she understood them. Then Mr. Biddy came in and discussed several things with petitioner with the detectives present. During that discussion, she made the crucial statement to him that she had found the child dead from having swallowed Liquid Plumr and, fearing that someone would blame her for it, had taken the body to the reservoir. After this statement she was booked for murder. Subsequently, the attorney summoned by Wright arrived and told petitioner not to talk to the police unless he was present. The next morning she took the police to the reservoir and identified the place where she had left the body. It was the same place where the body had been found.

Petitioner makes five separate contentions, under her general *Miranda* attack, on the use at trial of the statement she made on December 27 and her showing, on December 28, the place at the reservoir where she had left the child's body. Parenthetically, we have noted petitioner's complaint that the district court was in error in stating that nothing told to the police on December 27 was of any aid or benefit to the state, that the record did not indicate that anything she said was offered at the trial, and that her actions on December 28 were of no assistance in the state's case. These statements were clearly erroneous, but do not seem to have affected the district court's consideration of the controlling issues in the case. For the purposes of considering this appeal, we assume that the use of petitioner's statements and conduct on December 27 and 28 in the state trial was crucial to the successful prosecution and conviction of the petitioner.

██ The first two of petitioner's five points need not be addressed because, regardless of their merit, they would not control the outcome of this appeal. First, petitioner contends that the waivers signed on December 15 of her Sixth Amendment rights were vitiated in view of her later request for a lawyer, and that in any event the waivers were "stale" by December 27 when she made the statements admitted at trial. Our decision does not depend upon the con-

tinued legal effectiveness of those waivers.

The next question posed by petitioner is whether the oral warning, framed as a question as to whether she remembered her rights on December 27, just before she made the damaging statement, was an effective *Miranda* warning, in light of her request for a lawyer on December 15. We think that it was.

The critical legal question is whether the overall activity of the police sufficiently comports with the requirements concerning the *Miranda* warnings to insulate the conduct and admissions against suppression.

 It is clear that when a person knows her rights, and has even exercised the right to counsel, talking with counsel, later voluntary admissions can constitute a waiver of the rights to counsel and to remain silent. United States v. Brown, 459 F.2d 319 (5th Cir. 1971), cert. denied, 409 U.S. 864, 93 S.Ct. 155, 34 L.Ed.2d 111 (1972). The question is whether the full *Miranda* warnings were required on December 27 and 28, even though in response to the police question petitioner expressly stated that she remembered her rights as previously explained to her. We think not. We have previously held that "there is no requirement that an accused be continually reminded of his rights once he has intelligently waived them." United States v. Anthony, 474 F.2d 770, 773 (5th Cir. 1973). A great many courts, state and federal, have likewise held that repeated warnings are not necessary to a finding that a defendant, with full knowledge of his rights, knowingly and intelligently waived them. United States v. Anthony, 474 F.2d 770 (5th Cir. 1973); Miller v. United States, 396 F.2d 492 (8th Cir. 1968); Maguire v. United States, 396 F.2d 327 (9th Cir. 1968), cert. denied, 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969); Gorman v. United States, 380 F.2d 158 (1st Cir. 1967); United States v. Kinsey, 352 F.Supp. 1176 (E.D.Pa.1972); State v. Gallagher, 36 Ohio App.2d 29, 301 N.E.2d 888 (1973); Commonwealth v. Abrams, 443 Pa. 295, 278 A.2d 902 (1971); State v. Rowe, 77 Wash.2d 955, 468 P.2d 1000 (1970); State v. Blanchey, 75 Wash.2d 926, 454 P.2d 841 (1969); Brown v. State, 6 Md.App. 564, 252 A.2d 272 (1969); State v. Magee, 52 N.J. 352, 245 A.2d 339 (1968); People v. Hill, 39 Ill.2d 125, 233 N.E.2d 367 (1968); State v. Lucia, 74 Wash.2d 819, 447 P.2d 606 (1968); People v. Schenk, 24 Cal.App.3d 233, 101 Cal.Rptr. 75 (1972); People v. Brockman, 2 Cal.App.3d 1002, 83 Cal. Rptr. 70 (Ct.App.1969).

We think that a further delineation on December 27 of petitioner's rights, which she had stated that she understood from prior explanations, would have been needlessly repetitious. The district court was not clearly erroneous in finding that Mrs. Biddy fully understood her rights at the time she made the statement to her husband with the detectives present.

The argument that the request for an attorney on December 15 effectively foreclosed the legality of the activity on December 27 and 28 is not compelling. A series of cases have held that even though an attorney is once requested or retained, the right to an attorney can be subsequently waived. United States v. Hodge, 487 F.2d 945 (5th Cir. 1973); United States v. Dority, 487 F.2d 846 (6th Cir. 1973); United States v. Springer, 460 F.2d 1344 (7th Cir.), cert. denied, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972); United States v. Brown, 459 F.2d 319 (5th Cir. 1971), cert. denied, 409 U.S. 864, 93 S.Ct. 155, 34 L.Ed.2d 111 (1972); United States v. Green, 433 F.2d 946 (5th Cir. 1970); Wilson v. United States, 398 F.2d 331 (5th Cir. 1968), cert. denied, 393 U.S. 1069, 89 S.Ct. 727, 21 L.Ed.2d 712 (1969); Coughlan v. United States, 391 F.2d 371 (9th Cir.), cert. denied, 393 U.S. 870, 89 S.Ct. 159, 21 L.Ed.2d 139 (1968).

It appears from the facts of each case relied upon by the petitioner that, even though an attorney was requested, the defendants were not permitted the opportunity to exercise their right to consult with an attorney. United States v. Blair, 470 F.2d 331 (5th Cir. 1972), cert. denied, 411 U.S. 908, 93 S.Ct. 1536, 36 L.Ed.2d 197 (1973); United States v.

Priest, 409 F.2d 491 (5th Cir. 1969); United States v. Slaughter, 366 F.2d 833 (4th Cir. 1966). In the instant case, however, the petitioner was given the opportunity to consult with her attorney when requested. Even after consulting with her attorney she was free to remain silent and to have her attorney present during any interrogation. Having full knowledge of these rights, she could knowingly and voluntarily waive them on December 27. *Cf.* United States v. Brown, *supra*; United States v. Daulton, 488 F.2d 524 (5th Cir. 1973), cert. denied, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974). The district court was not clearly erroneous in finding that she did, in fact, waive those rights.

■ The fourth issue as to *Miranda* is stated in the appellant's brief as follows:

Whether *any* form of warning given on the morning of December 27, 1970, could comport with the requirements of *Miranda* when the police officer who claims to have given the warning, induces the damaging statements, after the appellant's attorney (obtained for appellant by her husband) left the police station because of his illness, and before the arrival of a second attorney known by police to be on his way to represent appellant, and whether said damaging statements elicited on December 27, 1970, can be admitted against her at her state trial.

The cases heretofore cited clearly indicate that the above issue must be resolved against the petitioner. A person may voluntarily speak without an attorney present, even though he knows one to be on the way upon request, if the police actions are not compelling. There is some question as to whether the activity between the police and the petitioner fall within the realm of "interrogation" as envisaged by *Miranda,* but even assuming the fact, with the husband present, and the knowledge that she need not speak until her attorney arrives, there is no legal impediment to voluntary statements.

■ The last issue posed by appellant's brief in connection with the *Miranda* issue is this:

Whether damaging admissions and conduct of appellant, induced by the police without any *Miranda* warning on the morning of December 28, 1970, after her arrest and when the police were specifically told by appellant's counsel that they were not to further question her can be admitted in evidence against her at her state trial.

The facts and law again resolve this issue against petitioner. She was positively told more than once on the morning of December 28 that she did not have to make the trip to the reservoir if she did not want to. She insisted that this is what she wanted to do. With full knowledge of her rights and the additional admonition that she need not go, there was no legal impediment to waiving those rights and making the trip. Having done so voluntarily, the conduct could be used at her trial.

Outside of the specific points raised by the petition, we have viewed the overall conduct of the police to see if we could sense unfair conduct that might, although technically correct, nevertheless indicate a pattern that is contrary to the spirit of the Fifth and Sixth Amendments and the progeny of *Miranda.* With this overview, we do not have the deep and abiding conviction necessary for a finding that the district court was clearly erroneous in its findings and conclusions of law.

The second major point raised by petitioner on appeal concerns four photographs, taken during the second autopsy, of physical sections of Mona Biddy's body. The first autopsy had been performed within hours after the discovery of Mona Biddy's body. During the first trial of this cause, which ended in a mistrial, the defense interposed a theory that the death of the child had been caused by laryngeal edema resulting from the ingestion of a caustic solution known as Liquid Plumr, a household drain cleaner. Between the first and second trial, the child's body was ex-

124

humed and a second autopsy performed, during which the neck organs were removed, placed in a preservative, and subsequently photographed in the laboratory. From the neck organs themselves certain microscopic slides were made and these, along with the paraffin blocks used in preparing the sections and the neck organs themselves, were turned over to the defendant's medical expert. Although the prosecutor was under a court order to turn over all medical data to the petitioner, the film from which the photographs were made was turned over to the Jackson Police Detective Bureau for developing. The state's medical witness could not recall whether he saw the photographs after their development.

At the second trial, the four photographs were admitted into evidence without objection, after defendant's attorney stated that he had not seen them before trial and asked for a brief recess. A five minute recess was taken. The defense's experts testified that they could not determine the cause of death of the child from the information contained in the autopsy report or in these photographs.

Petitioner's medical experts now say, and they so testified before the district court, that they can state with a reasonable degree of medical probability that the cause of death of Mona Biddy was the ingestion of Liquid Plumr, rather than strangulation or suffocation. These opinions were arrived at after reconsidering the photographs.

These photographs raise two problems, one of which we consider here, and one of which we do not.

■ To the extent that the argument is based on Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and a theory of state suppression of exculpatory evidence, we find no merit to the petitioner's contention, and affirm the district court's ruling. The state had no experts who would testify that the photographs revealed any doubt as to the cause of death, and there was, in fact, no suppression of evidence. The photographs were introduced at trial without objection, and there is no indication that the defense could not have had its experts take as much time as they needed to study the photographs during the trial. The case simply does not fall within the Brady proscription of evidence suppression. See, e. g., United States v. Cole, 449 F.2d 194, 198 (8th Cir. 1971), cert. denied, 405 U.S. 931, 92 S.Ct. 987, 30 L.Ed.2d 806 (1972); United States v. Moore, 439 F.2d 1107, 1108 (6th Cir. 1971); United States v. Evanchik, 413 F.2d 950, 952–953 (2nd Cir. 1969); United States v. Jordan, 399 F.2d 610 (2nd Cir.), cert. denied, 393 U.S. 1005, 89 S.Ct. 496, 21 L.Ed.2d 469 (1968). Furthermore, the failure to produce the photographs pursuant to the discovery order of the state court, even if error as a state procedural matter, does not rise to a constitutional level. See, e. g., Woodward v. Beto, 447 F.2d 103, 105 (5th Cir.), cert. denied, 404 U.S. 957, 92 S.Ct. 325, 30 L.Ed.2d 275 (1971).

■ The other prong of defendant's argument is not subject to review in a federal court because it has never been presented to a state court. The argument is that with these photographs and the new opinions of the expert defense witnesses, it now appears that the defendant is armed with evidence that no crime was ever committed. This is in the nature of newly discovered evidence. The point has not been presented to the state court, so that it cannot properly be reviewed by a federal court at this time. To the extent that the district court judgment may have passed upon this question, it is modified. Cf. Ross v. State of Texas, 474 F.2d 1150 (5th Cir.), cert. denied, 414 U.S. 850, 94 S.Ct. 141, 38 L.Ed.2d 98 (1973).

Affirmed.