THE STATE OF WASHINGTON, *Respondent*, v. THOMAS L. THOMAS, *Appellant*.

*Ronald D. Ness,* for appellant (appointed counsel for appeal).

*John C. Merkel, Prosecuting Attorney,* and *Carmon Danny Clem, Chief Criminal Deputy,* for respondent.

REED, J.—The defendant Thomas L. Thomas appeals from his convictions for second-degree burglary, grand larceny, and second-degree assault, and from a habitual criminal finding resulting in the imposition of a life sentence. We affirm.

In September 1967, a delinquency petition was filed in Kitsap County Juvenile Court charging defendant, then 17 years of age, with taking a motor vehicle without permission of the owner, and grand larceny, both felonies. On September 8, 1967, after a hearing, the juvenile court de-

clined jurisdiction and orally remanded defendant to superior court to be tried as an adult. No written order was entered in juvenile court. Defendant became 18 on September 19, and on December 26 an information charging the offenses was filed in Kitsap County Superior Court. Defendant thereafter pleaded guilty to the "auto-theft" and the larceny charge was dismissed. Defendant was sentenced on February 14, 1968, to a term of 10 years. Throughout these proceedings defendant was represented by counsel.

January 13, 1973, defendant pleaded guilty to second-degree burglary, grand larceny, and second-degree perjury and received a sentence of 15 years on the burglary charge; sentencing was deferred for a period of 5 years on his convictions of grand larceny and perjury. As a result of these convictions and defendant's involvement in other criminal activities, with which he was not charged, the Kitsap County prosecuting attorney warned him that any further violations of the law would subject him to habitual criminal charges.

At 10 a.m., July 31, 1974, defendant, who is black, accompanied by a black male wearing sunglasses and an Aussie-type hat, with folded brim, rented a distinctive Ford Econoline van, Washington license GP 5050, from Hertz Truck Rentals in Seattle. At 11:30 a.m. that day, such a van containing two black males was observed in Tacoma by Dorilee Shobert, who later selected a picture of Robert Clewis as a possible driver of the van and identified his hat as being similar to that worn by the driver. About noon Marita Herzog observed such a van, with two black subjects, at her service station in Purdy, and later selected photos of Clewis and defendant as possible driver and passenger. At about 1 p.m., Charles Buckingham of Port Orchard observed two Blacks in a Hertz rental van execute a U-turn on the Tacoma-Bremerton highway at a point two or three blocks from the Phillip E. Carr residence, located approximately 3 miles south of Port Orchard. The Carr residence is partially visible from the highway at that point.

At 1:15 p.m., Mr. Carr returned to his home and discovered a Hertz rental van in his driveway and two black males running into his home. Mr. Carr approached the van and, seeing his TV set therein, started to a neighbor's home to phone police when he was set upon from behind, thrown to the ground, and struck near the eye with a fist. He could not identify his assailant, describing him only as being "pretty fair-sized" or "rather big." Mr. Carr managed to extricate himself and continued to the neighbors where he reported the burglary in progress, giving the van's license number as AGA 550 or AGD 550. Returning to his home, he noted miscellaneous household goods and clothing collected near the door as if ready for loading; that entry to the home had been gained through an upstairs window; and that a .22 pistol and some watches were missing. Found at the struggle site were several of Mr. Carr's business cards, his fountain pens and watch, and a pair of sunglasses similar to those worn by defendant's companion in Seattle.

August 1, 1974, the defendant and Clewis returned the van to Seattle where they were arrested by police to be held for Kitsap County officers. Clewis was wearing the distinctive Aussie-type hat, which several other witnesses identified as similar to that worn by the driver of the van on July 31. Investigation revealed only two such vans had been rented on July 31, one to the defendant and the other to a Caucasian. Inspection of the vehicle revealed its speedometer had been recently disconnected; defendant is a trained auto mechanic.

August 1, 1974, Detective Jack Dean of the Kitsap County Sheriff's office drove to Seattle to take the two men into custody. Dean had known defendant since age 14, had coached him on a boxing team, and had given him his *Miranda* rights once in connection with the 1968 offenses, and twice in connection with burglary arrests in 1973. Detective Dean informed defendant he was under arrest for burglary, and began to advise him of his constitutional rights. The detective managed to inform defendant he had a right to remain silent and anything he said could be used

against him, when defendant interrupted him, saying he knew his rights. Dean persisted, however, testifying as follows:

Q  How did he interrupt you?
A  He just—you know—"come on, Man, meet me." He wanted to tell me about the case, and I advised him that I had to do it by the book. And I then advised him he had the right to talk to an attorney before any interview and before making any statement. When I was doing that, he reminded me that I knew that he knew what his rights was, and it's kind of like—you know—let's not be silly. And so I stated to him, I said, "Okay, Tommy. If it comes to court you have been advised of your rights. Is that right? And you understand." And he said, "Right." So I said, "Okay."

Q  Then what happened?
A  Well, then, he asked me what kind of case that they had on him over there, and I recalled that I explained to him what's happened, happened, he couldn't change it—you know—that I didn't want to talk about it. Let's talk about boxing or something like this.

Q  Then what happened?
A  He asked me—you know—several more questions about, you know, "how can they prove I did it," and I asked him—I asked him how he could become so stupid, or how could he become involved in such a stupid crime.

Defendant thereupon told Dean he had a heroin habit of $100 per day. Thereafter, the officer asked no further questions, telling defendant only that the police had been awaiting return of the rental truck and that he was under arrest for burglary; he did not mention the Carr residence. Later, while being transported in Dean's auto to Kitsap County, the defendant stated that Clewis was not involved in the crime and assured Clewis, in Dean's hearing, that he would give a statement clearing Clewis. The defendant asked if he could avoid imprisonment by cooperating and was told, "No" by Detective Dean, who reminded him he had previously been threatened with habitual criminal proceedings. Defendant asked about drug programs and was told

before he ought to be talking about anything like that,

that he should be thinking about getting the television set and the stolen gun back to the owner. And I asked him if that could be done. And he stated that he could do it if he decided to go that way.

Defendant continued to question the officer about his chances for drug rehabilitation and treatment instead of prison if he cleared up the crimes. As the auto neared the Kitsap County courthouse the defendant asked it be stopped, telling Dean he would give a statement "clearing that crime" and repeating to Clewis he would exonerate him.[1] Defendant added he could recover the gun and TV, but that he wanted to talk to his attorney before giving the statement. Dean told him he did not want a statement and conversation ended.

August 2, Dean again spoke with defendant who declined to make any further statement until he consulted with an attorney. Defendant was then charged with second-degree burglary, grand larceny, and second-degree assault. September 20, 1974, a CrR 3.5 hearing was held on the admissibility of defendant's conversations with Officer Dean and the State presented evidence that:

1. January 1968 Detective Dean gave defendant his *Miranda* rights in writing and defendant acknowledged in writing he understood his rights, desired to waive them and make a statement, which he did.

2. March 16, 1970, Detective Jack Kvistad read defendant his rights from a *Miranda* card while defendant was under arrest for burglary.

3. December 3, 1971, Detective Maves of the Bremerton Police Department gave defendant his rights on two separate occasions while interviewing him about an assault and robbery.

4. December 24, 1971, Officer Johnson of the Bremerton Police Department read defendant his rights from a *Miranda* card prior to discussing an armed robbery.

---

[1]The statements to Clewis would have been admissible in any event, since they were made to a third person and simply overheard by the officer.

5. June 21, 1972, Detective Clifton of the Kitsap County Sheriff's office read defendant his rights in the presence of the prosecuting attorney who was questioning him about a number of crimes under investigation. As each right was read and at the conclusion, the defendant was asked if he understood, responding "yeah" each time. In exchange for an agreement not to prosecute, the defendant then gave an oral statement. June 22, 1972, the same rights were given in writing, acknowledged in writing, and defendant signed a waiver and gave a written statement.

Defendant testified at the "voluntariness" hearing he could not recall Officer Dean telling him anything other than he had the right to remain silent. Defendant acknowledged he had been arrested approximately 15 times, had been advised of his rights on numerous occasions, knew he could remain silent, knew that an attorney would be appointed by the court if he had no funds and that he could have demanded an attorney before talking to Officer Dean. Defendant did not challenge Officer Dean's version of the encounter except to deny he told Dean anything about returning the TV and gun "cause I didn't know anything about no TV or no gun." Defendant identified various documents evidencing he had previously received his constitutional rights, had waived those rights and elected to make statements as previously testified by the officers.

After the hearing, the trial judge ruled defendant knew his rights, that the statements given to Officer Dean were voluntary and were admissible against him. After trial in September 1974, the jury returned verdicts of guilty on all three counts. October 2, 1974, defendant was charged by supplemental information with being a habitual criminal. Defendant's motion to suppress his 1968 conviction for failure of the juvenile court to enter a written order declining jurisdiction was denied; defendant elected a trial to the court and was found to be a habitual criminal and sentenced to life imprisonment. RCW 9.92.090.

The defendant appeals and his assignments of error raise these issues:

1. Were defendant's statements to Officer Dean inadmissible because he was not fully advised of his constitutional rights per *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966)?

2. Did the court's instruction on circumstantial evidence constitute reversible error?

3. Does Kitsap County's practice of requiring secret peremptory challenges deny a fair trial?

4. Did the trial court abuse its discretion by permitting the State's fingerprint witness to testify?

5. Did lack of a formal remand order render defendant's 1968 conviction invalid for use in the habitual criminal proceedings?

6. Is RCW 9.92.090 unconstitutional because of the manner in which it is or may be applied, *i.e.*, was defendant denied due process and equal protection under the law or subjected to cruel and unusual punishment because he was the only person proceeded against as a habitual criminal during the prosecuting attorney's more than 3 years in office?

## MIRANDA WARNINGS

Defendant contends any statements made to Officer Dean should have been suppressed because they were not preceded by a complete recitation of the *Miranda* rights. *Miranda v. Arizona, supra.* The State argues this was not necessary because it was later proven defendant knew his rights, having received them on various occasions in the past. Neither position is entirely correct. It is true the following excerpts from *Miranda* would seem to dictate suppression.

> The Fifth Amendment privilege is so fundamental to our system of constitutional rule and the expedient of giving an adequate warning as to the availability of the privilege so simple, *we will not pause to inquire in individual cases whether the defendant was aware of his rights without a warning being given.* Assessments of the knowledge the defendant possessed, based on information as to his age, education, intelligence, or prior contact

with authorities, can never be more than speculation; a warning is a clearcut fact.

(Footnote omitted. Italics ours.) *Miranda v. Arizona, supra* at 468-69.

To summarize, . . . He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. *But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.*

(Footnote omitted. Italics ours.) *Miranda v. Arizona, supra* at 478-79.

Accordingly we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation under the system for protecting the privilege we delineate today. As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, *this warning is an absolute prerequisite to interrogation. No amount of circumstantial evidence that the person may have been aware of this right will suffice to stand in its stead.* Only through such a warning is there ascertainable assurance that the accused was aware of this right.

(Italics ours.) *Miranda v. Arizona, supra* at 471-72.

█ *Miranda*, therefore, prohibits any collateral inquiry relative to a defendant's awareness of these rights as a substitute for the warnings. To the extent the trial court considered such collateral evidence and found the warnings were not required because defendant had many times been advised of his rights and did in fact know them, it appears to have pursued a course of action contrary to the *Miranda*

mandate. We will not overturn the trial court's finding, however, because these considerations were rendered *unnecessary* by defendant's refusal to listen. Not once but twice, the defendant took it upon himself to interrupt as the officer attempted to fulfill his duty to inform. In these circumstances defendant elected to waive *his right to be informed* and chose to discuss selective aspects of the charges against him in an apparent attempt to strike a bargain short of imprisonment. Whether he knew them or not makes no difference. By his actions we hold him charged with that knowledge; he is estopped to claim *Miranda's* protection.

Other courts have reached a similar result, *Myers v. State,* 256 So. 2d 400 (Fla. 1972); *State v. Ouimette,* 110 R.I. 747, 298 A.2d 124 (1972); *State v. Wilson,* 26 Ohio App. 2d 23, 268 N.E.2d 814 (1971); *State v. Perez,* 182 Neb. 680, 157 N.W.2d 162 (1968). Still others have held to the contrary, *Dupont v. United States,* 259 A.2d 355 (D.C. App. 1969); *Walker v. United States,* 250 A.2d 553 (D.C. App. 1969).

■■ Having determined that defendant Thomas was properly charged with knowledge of his rights, so that further warnings were not necessary, we now address whether he waived those rights knowingly and intelligently, *i.e.,* whether the State successfully carried the "heavy burden" of demonstrating such a waiver. *Miranda v. Arizona, supra* at 474; *State v. Davis,* 73 Wn.2d 271, 438 P.2d 185 (1968). In this regard, although the trial court made no specific finding of waiver, we think such a finding is implicit, both from its finding the statements were voluntary and its action of admitting them into evidence. *State v. Haverty,* 3 Wn. App. 495, 499, 475 P.2d 887 (1970); *State v. Collins,* 74 Wn.2d 729, 732, 446 P.2d 325 (1968); *State v. Vangen,* 72 Wn.2d 548, 554, 433 P.2d 691 (1967). The trial court's finding of waiver must, of course, be supported by substantial evidence in the record. Defendant Thomas did not expressly or otherwise affirmatively waive his rights, either orally or

in writing, as might seem to be required by the following language from *Miranda* on page 475:

> An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained. A statement we made in *Carnley v. Cochran*, 369 U. S. 506, 516 [8 L. Ed. 2d 70, 77, 82 S. Ct. 884] (1962), is applicable here:
>> "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."

Waiver need not be expressed, however, but may be inferred from all the facts and circumstances surrounding the giving of the statement, *State v. Blanchey*, 75 Wn.2d 926, 454 P.2d 841 (1969). As stated in *United States v. Hayes*, 385 F.2d 375 (4th Cir. 1967), at pages 377-78:

> Thus, we cannot accept appellant's suggestion that because he did not make a statement—written or oral—that he fully understood and voluntarily waived his rights after admittedly receiving the appropriate warnings, his subsequent answers were automatically rendered inadmissible. Of course, the attendant facts must show clearly and convincingly that he did relinquish his constitutional rights knowingly, intelligently and voluntarily, but a statement by the defendant to that effect is not an essential link in the chain of proof.

As *Blanchey* makes clear, while *Miranda* prohibits the presumption of waiver from a mere warning followed by a confession or admission, it does not preclude finding a waiver from the attending facts or circumstances. *State v. Blanchey, supra* at 933.

On the issue of waiver, recourse may be had, *inter alia*, to the same "collateral" evidence which will not support dispensing with the warnings in the first instance. *Cf. State v. Haverty, supra.* That evidence clearly shows defendant was no stranger to criminal interrogation procedure; he

had been informed of his rights on numerous occasions, both orally and in writing; he had acknowledged both orally and in writing that he understood those rights; he had on several occasions executed written waivers of those rights before providing written statements to the police. Defendant admitted he knew he had a right to remain silent and that anything he said could be used against him; he knew his right to consult an attorney before talking to Officer Dean and that the court would provide a lawyer if he could not afford one. On a prior occasion he traded apparently incriminating information for immunity from prosecution. Finally, on August 2, 1974, he would give no further statement because he had not consulted with his lawyer. In our view the State satisfied its *Miranda* burden of showing defendant was aware of his rights and made a conscious decision to forego them. *State v. Blanchey, supra* at 935.

### CIRCUMSTANTIAL EVIDENCE INSTRUCTION

█ Defendant next contends, even though he took no exception thereto, the trial court denied him a fair trial by giving instruction No. 6 on circumstantial evidence, which used the words "should be consistent with the guilt of the defendant, and inconsistent with his innocence." Defendant relies on *State v. Moorer*, 5 Wn. App. 252, 486 P.2d 1152 (1971), in which we held, even though the defendant there had taken no exception, that a fair trial was denied by an instruction employing the word "should" rather than "must." We took pains in *Moorer* to point out it was the totality of the circumstances, *i.e.*, only slight evidence coupled with other slanted instructions, which compelled a reversal and we did not rule out the instruction in all cases. Our decision made no reference to *State v. Cerny*, 78 Wn.2d 845, 480 P.2d 199 (1971), in which our Supreme Court approved essentially the same instruction. Further, *State v. Gosby*, 85 Wn.2d 758, 539 P.2d 680 (1975) firmly established that such an instruction, however phrased, should never be given because it tends to mislead the jury into believing the State has a *higher* burden of proof in cases

involving circumstantial evidence. The *Gosby* court concludes the instruction is more beneficial than detrimental to a defendant. Defendant Thomas was not prejudiced by the giving of such an instruction.

### SECRET PEREMPTORY CHALLENGES

██ Defendant next argues that Kitsap County's use of secret—written—peremptory jury challenges denies both a fair and public trial. We are cited to no authority for this proposition and we fail to see how this practice, which is utilized in several counties in this state,[2] could in any way prejudice the defendant. There are no state or federal constitutional guaranties of a right to peremptory challenges, the number and manner of exercise of which rests exclusively with the legislature and the courts, subject only to the requirement of a fair and impartial jury. *State v. Persinger*, 62 Wn.2d 362, 382 P.2d 497 (1963). This assignment has no merit.

### EXPERT WITNESS QUALIFICATIONS

██ Defendant claims the trial court erred when it permitted Officer Larry Worland of the Bremerton Police Department to testify defendant's fingerprints matched those of the subject of the two prior felony convictions. It is argued that Officer Worland's 2 weeks of concentrated training in an FBI-sponsored course in fingerprint identification did not sufficiently qualify him as an expert. Competency of a witness to testify as an expert is addressed to the sound discretion of the trial court. *State v. Parker*, 9 Wn. App. 970, 515 P.2d 1307 (1973). Officer Worland had served 8 years with the police department, 1½ years in the identification division of that department, had taken "a couple of hundred" sets of fingerprints, and possessed a 2-year college degree in law enforcement.

He testified at length on the science of fingerprint identification as a prelude to his testimony. There was no abuse of discretion.

---

[2] *Directory of Services for Washington Lawyers*, Washington State Bar Association (1968).

## JUVENILE COURT REMAND

Defendant maintains his 1968 conviction was invalid because the juvenile court failed to enter a formal order declining jurisdiction and remanding him for trial as an adult. He argues the superior court therefore lacked jurisdiction and his conviction may not be used as the basis for a habitual criminal finding. Age at the time of trial determines jurisdiction in such cases, and a juvenile court loses jurisdiction over a pending cause which is not heard on its merits prior to a youth's attaining age 18. *State v. Setala*, 13 Wn. App. 604, 536 P.2d 176 (1975); *State v. Brewster*, 75 Wn.2d 137, 449 P.2d 685 (1969); *Sweet v. Porter*, 75 Wn.2d 869, 454 P.2d 219 (1969); *State v. Ring*, 54 Wn.2d 250, 339 P.2d 461 (1959). Defendant Thomas was 18 years of age when he appeared in superior court with counsel and entered his pleas of guilty. Failure to enter a formal order or remand does not change the result. *State v. Setala, supra* at 606.

## CONSTITUTIONALITY OF RCW 9.92.090

Lastly, defendant contends the habitual criminal statute, RCW 9.92.090[3] is unconstitutional because (1) it was applied in an arbitrary and discriminatory manner, thereby depriving defendant of equal protection of the law and due process, and (2) the mandatory penalty for life imprisonment is cruel and unusual punishment. In support of these claims defendant called the Kitsap County prosecuting attorney as a witness to establish defendant was the only person charged as a habitual criminal during the prosecutor's approximate 4-year term in office, although a number of other persons qualified under the statute. Defendant argues that his being singled out was an arbitrary and discriminatory application of the statute, depriving him of equal protection of the law and due process, citing *State v.*

---

[3]RCW 9.92.090 provides in relevant part:

"Habitual criminals. . . .

"Every person convicted in this state . . . of any felony, who shall previously have been twice convicted, . . . of any crime which under the laws of this state would amount to a felony, . . . shall be punished by imprisonment in the state penitentiary for life."

*Anderson*, 12 Wn. App. 171, 528 P.2d 1003 (1974), and *State v. Nixon*, 10 Wn. App. 355, 517 P.2d 212 (1973). The trial court concluded otherwise, based on its finding of fact No. 4, which reads:

That approximately fifteen persons were technically subject to the Habitual Criminal Statute RCW 9.92.090, during the terms of Kitsap County Prosecutor John C. Merkel, but the defendant, THOMAS L. THOMAS, is the only person ever charged as being an Habitual Criminal under that statute during the term of said John C. Merkel, but said John C. Merkel, Prosecutor for Kitsap County since 1971 testified that there were reasons for not charging the other persons either because they were alcoholics, did not present a danger in a physical way to any person in the community; the prosecutor's office during the time of some of the persons involved, did not have the expertise to charge Habitual Criminal proceedings and follow them through, some of the persons involved through plea bargaining pled guilty in return for the prosecutor's promise not to charge them with being an Habitual Criminal; some of the defendants were made a deal that if they pled guilty and gave evidence involving other persons that they would not be charged with being an Habitual Criminal; that Prosecutor John C. Merkel did not arbitrarily and capriciously decide to single out THOMAS L. THOMAS as the person to be charged with being an Habitual Criminal under RCW 9.92.090, but he did make a decision by reviewing the defendant's past record, the defendant's known criminal activity in the community, the type of criminal activity the defendant had been and was involved in, the possibility for the defendant to be rehabilitated, and the fact that the defendant had previously been warned that any more criminal activity would result in his being charged with being an Habitual Criminal.

■ The prosecutor's selective application of a criminal statute, whether it defines criminal activity or prescribes increased punishment in a given set of circumstances, does not offend against due process, nor deprive a defendant of equal protection of the law in the absence of proof the choice was made without reasonable justification or was motivated by a design to intentionally and purposefully

discriminate against a particular defendant or class. *State v. Anderson, supra; State v. Nixon, supra.* As stated in *Oyler v. Boles,* 368 U.S. 448, 7 L. Ed. 2d 446, 82 S. Ct. 501 (1962), at page 456:

Moreover, the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that the selection was deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification. Therefore grounds supporting a finding of a denial of equal protection were not alleged.

In this case the prosecuting attorney determined the defendant was gravitating from nonviolent to violent crime, that his prior incarcerations had not resulted in rehabilitation, that he had plotted further criminal activities while in prison, apparently had no real desire to "go straight" and presented a "danger to society,—to the people of Kitsap County." This evidence amply supports the trial judge's factual finding and conclusion.

Defendant's contention the life sentence prescribed by RCW 9.92.090 constitutes cruel and unusual punishment is without merit. Enhanced penitentiary terms for repeating felons who have had the opportunity for, but have not embraced rehabilitation, cf. *State v. Mitchell,* 2 Wn. App. 943, 472 P.2d 629 (1970), *State v. Jones,* 138 Wash. 110, 244 P. 395 (1926), do not per se constitute cruel and inhuman punishment as prohibited by the eighth and fourteenth amendments to the United States Constitution, and article 1, section 14 of the Washington State Constitution. *Cf. State v. Bresolin,* 13 Wn. App. 386, 534 P.2d 1394 (1975); *State v. Rose,* 7 Wn. App. 176, 498 P.2d 897 (1972). Nor, as we have said, is there any showing in this case the statute has been applied to the defendant in such an arbitrary and discriminatory manner as to make the punishment in his case either cruel or unusual. The prosecuting attorney had a rational basis for exercising his discretion to treat defendant differently from others who might have technically qualified under the statute. In approving the

imposition of consecutive prison terms for various counts arising out of a single transaction, we said in *State v. Rose, supra* at 183:

> The constitutional impediments to types of punishment are limited to cruel or unusual punishment—not harsh punishment. U.S. Const. amend. 8; Const. art. 1, § 14. All punishment by confinement in a penitentiary is harsh in the sense that it is strongly unpleasant to the person upon whom it is inflicted. We do not, however, find that the statutory minimum period of confinement or the statutory maximum period of control is either cruel or unusual in view of the gravity of the crimes perpetrated by the defendant.

As subjectively applied to defendant Thomas, we find the life sentence imposed upon him to be neither cruel nor unusual.

Defendant's remaining arguments under this heading have no merit.

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.