*1017
 
 BARNES, J.,
 

 for the Court:
 

 ¶ 1. A Lamar County grand jury returned a two-count indictment against Charles Anderson for murder and arson. During his first trial, Anderson was convicted of manslaughter, but the jury was unable to reach a verdict on the arson charge. Anderson was retried on the arson charge, and the jury found him guilty. The trial court sentenced him to twenty years in the custody of the Mississippi Department of Corrections, to be served consecutively with the sentence previously imposed for the manslaughter conviction. Anderson was also ordered to pay restitution.
 

 ¶ 2. Anderson now appeals his conviction for arson, challenging the weight and sufficiency of the evidence, as well as claiming ineffective assistance of counsel and the denial of his fundamental right to a fair trial. Finding no error, we affirm.
 

 STATEMENT OF THE FACTS AND PROCEDURAL HISTORY
 

 ¶ 3. On the evening of April 19, 2003, at approximately 9:30 p.m., law enforcement was called to Anderson’s residence in Lamar County, Mississippi, to investigate a fire and a shooting. When they arrived on the scene, law enforcement found Anderson’s home ablaze and Shelton Smith shot dead on the carport.
 

 ¶4. It was discovered Anderson was having an affair with Shelton’s wife, Cathy. Anderson, who was divorced from Ann Stockstill, lived in a house that was jointly owned with his ex-wife, which was located on her family’s property. Ann’s brother, Owen Stockstill, lived on this property as well, in a separate house, with his wife Debra and daughter Megan. The weekend before the incident, Owen stated that Shelton had stopped by his house and told Owen that he was “having problems with his wife, that she had left and he was done with her this time.”
 

 ¶ 5. On the night of April 19, it was discovered Anderson had invited Shelton to his house in order to sell him tapes proving his wife’s infidelity. It was not known whether, at that time, Shelton knew Anderson was having sexual relations with his wife. The State’s theory of the case was that Anderson killed his paramour’s husband and then committed arson to be rid of the jointly owned house with his ex-wife. Conversely, the defense’s theory of the case was that Shelton had a motive to burn Anderson to death, as Shelton was going through a divorce and was seeking retribution against Anderson for having an affair with his wife.
 

 ¶ 6. Approximately four or five days before the incident, Shelton had contacted W.F. Steele, Chief Investigator of the Lamar County Sheriffs Office, because Shelton had received several phone messages from a person trying to sell him video tapes for $10,000 of his wife and another man having an affair. Deputy Steele’s investigation identified Anderson as the person who had left the messages on Shelton’s phone. Shelton went to Anderson’s house the night of April 19 to purchase these tapes twice: the first time he did not purchase the tapes, but he returned the second time because Anderson had offered him the tapes for the discounted price of $500.
 

 ¶ 7. Arriving on the scene on April 19, Deputy Steele put crime-scene tape around Anderson’s residence, then photographed and collected evidence. Early on the morning of April 20, Anderson gave a statement at the sheriffs office to Deputy Steele. After receiving his
 
 Miranda
 
 warnings and signing a waiver-of-rights form, Anderson gave his version of the events, which was read to the jury and entered into evidence:
 

 
 *1018
 
 Somewhere around 8:30 ... I went to bed, hadn’t been asleep very long and the dogs were barking. I got up to go to make my dogs be quiet. When I opened my bedroom door I saw Shelton Smith standing in the hallway and then the next thing I saw was a small flame and then the whole hallway was on fire. I immediately went back in my bedroom. I don’t remember if I shut my door or not, but I think I did. The windows in my bedroom were already open and I pushed the screen out, went out the window, took my 12-gauge shotgun that was beside the window. He went running behind his truck and I immediately went up on the carport....
 

 Reiterating where he saw Shelton, Anderson continued:
 

 I opened the door from my bedroom and went to step into the hall and I saw him standing at the other end of the hallway. ... I didn’t say a word, but whenever I opened the door and stepped out there he said, hollered something like “die you son-of-a-bitch, die” or something and lit a match or cigarette lighter or something then the whole hall was afire.... I could smell gasoline when I opened the door. It had to of been gas ... nothing eome[s] that fast.... I broke and went back to my bedroom, went out the window and went out there and ran from around a blue car and he was on the end of the carport....
 

 Anderson added that he did not remember “stepping in any” gasoline.
 

 ¶ 8. Deputy Steele testified that there were several gas cans under Anderson’s carport. One of the gasoline cans was “away from the others” with a loose cap and only half a gallon of gas in it. No fingerprints were found on the can. Deputy Steele also observed the burn pattern in the house, which indicated an accelerant substance “was poured from the carport door all the way through the living room area and back to the end of the hallway” (where Anderson’s bedroom was located). A shotgun, devoid of burn or soot marks, was recovered from the carport. Deputy Steele did not know if, at the time of his death, Shelton was aware that Anderson was having an affair with his wife.
 

 ¶ 9. Telephone records showed that between April 1 and 19, 2003, Anderson had made forty-five telephone calls to Shelton’s wife, Cathy, and she had made sixty-four calls to Anderson. Moreover, on the date of April 19, 2003, eight telephone calls were made between Anderson and Cathy, with seven of those calls made between 4:00 p.m. and the time of the fire. Initially, Anderson denied he was having a sexual relationship with Cathy, but Cathy admitted the affair to law enforcement on the night of the fire.
 

 ¶ 10. Preston Burkhalter, with the Lamar County Sheriffs Department, testified that on April 19, 2003, he was dispatched to the scene where he found smoke coming from Anderson’s house and Shelton’s body lying next to his pickup truck in the carport. Law enforcement decided to move Shelton’s truck so that firefighters could put out the fire, and they retrieved the keys from Shelton’s pocket. Deputy Burkhalter then found the shotgun under the carport and secured it in the backseat of his patrol car. There were no burn marks on the gun.
 

 ¶ 11. Owen testified that he, his wife, and daughter lived approximately 100 to 150 yards down the road from his ex-brother-in-law, Anderson. At approximately 8:45 p.m. on April 19, Owen stated that he, his wife Debra, his daughter Megan, and his daughter’s boyfriend were at home “watching TV when the dogs started barking and [Anderson] came running up on the porch and run into the door and fell back out on the porch. We went out and
 
 *1019
 
 helped him up, brought him inside and put him on the couch. And I asked him what happened and he said that Shelton was trying to burn his house down and that he shot [Shelton].” Anderson was barefoot and wearing pajamas.
 

 ¶ 12. Debra then called 911, while Owen, Megan, and Megan’s boyfriend got into Owen’s truck and went to Anderson’s home. They were the first people to arrive on the scene. As he pulled into the carport, Owen saw Shelton’s body lying next to his truck. It was determined that Shelton was deceased. Owen stated: “The house was just billowing black smoke ... around all the windows, the vents, the doors, but I could not see a flame at all.” Owen noticed a shotgun lying on the carport in front of Anderson’s vehicle.
 

 ¶ 13. Megan testified that she, her mother, her father, and her boyfriend all “heard some shots go off’ but thought little of it as there are many hunters in the area. Shortly thereafter, Anderson “came running up” to the house, “ran on the porch and collapsed” at the front door. She corroborated her father’s testimony about the ensuing events. Additionally, Megan testified that later that evening, she noticed the smell of gasoline on the armrest of the couch upon which Anderson had been sitting. Debra corroborated the testimony of her daughter and husband. She also testified that she smelled gasoline on Anderson after they put him on the couch.
 

 ¶ 14. William Courtney, a paramedic who was dispatched to the scene, explained that he found “two patients” — “[o]ne having chest pains and one that was deceased.” Courtney related that Anderson stated his dogs woke him up, “at which time he went outside into the hallway of his bedroom, found Mr. Shelton in his hallway. Some expletives from Mr. Shelton. And then he ignited a fire in the house.” Anderson told Courtney he went to his bedroom to escape and went around the other side of the house. “At that point he encountered Mr. Shelton and it went from there.” When Anderson, who was on a stretcher, was being unloaded from the ambulance at the hospital, Courtney noticed the smell of gasoline on Anderson’s lower extremities.
 

 ¶ 15. Joe Crawford of the State Fire Marshal’s Office was accepted by the trial court as an expert in the field of causation, origin, and properties of fire. Crawford explained when he arrived at the scene, the house was still burning; so, he only examined the perimeter of the structure that night. He returned approximately two days later to commence his initial investigation of the house’s interior. There were indications of accelerant, like gasoline, on the flooring before it burned. The most extensive part of the fire was inside the hallway. Crawford determined the “burn pattern existed from the carport door, [past the living room area and a wrap-around couch] all the way down near the bedroom of Mr. Anderson.” Crawford was of the opinion the fire was incendiary; it was not an act of God, and it was not electrical. He was also of the opinion that the fire was ignited near Anderson’s bedroom.
 

 ¶ 16. During Crawford’s direct examination, the State sought to refer to a statement by Anderson where he indicated Shelton was in the hallway. Defense counsel asked to approach the bench, stating to the judge he objected to a statement Crawford had received from Anderson without being Mirandized. The trial court overruled the defense’s objection and allowed the State to refer to Anderson’s statement that was already in evidence, which was taken at the same time that Anderson had signed a
 
 Miranda
 
 warning and waiver-of-rights form. Crawford pro
 
 *1020
 
 ceeded with his testimony, stating in his opinion, if Shelton had been where Anderson claimed he was, Shelton would have been “badly burned .... [b]ecause when fire burns, it burns up and it burns out. And when you have accelerant that’s used in a fire, then the fire itself burns more intensely. So ... he would have been totally engulfed in fire if he had been there.”
 

 ¶ 17. Importantly, the autopsy of Shelton’s body showed no evidence of burns; nor were his clothes burned. Law enforcement officers were unable to recover Shelton’s clothes for testing of accelerant, but his shoes and body were tested, as were Anderson’s pajamas. No accelerant was found on any of these items. Shelton had approximately $1,200 in cash on his person. Found in Shelton’s shirt pocket were a memo book and a cigarette lighter. Found inside Shelton’s pickup truck, which was locked, were an icepick, a screwdriver, a pistol, and a box of matches. Deputy Steele testified that Emma Shelton had given Shelton the matches that day for burning some trash on her place.
 

 ¶ 18. During Crawford’s cross-examination, defense counsel had him read his case summary to the jury, and it was entered into evidence. The summary related his investigation of the incident. After his initial visit to the scene, Crawford explained he went to the Lamar County Jail to gather information from Anderson about the fire. Crawford said Anderson told him that when the fire was set, Shelton was standing in the hallway near “the living room area of the home behind the couch looking toward his bedroom.” At trial, it was Crawford’s personal opinion that the fire had started approximately three-quarters of the way down the hallway near Anderson’s bedroom. This opinion was in conflict with Crawford’s earlier report, dated May 29, 2003, which stated that the fire had started near the kitchen area “near the [carport] door where there was a rug.” Crawford apparently changed his mind about this matter, but it is unclear from the record why. In the report, Crawford maintained “[t]here was nothing that indicated that the fire was accidental.... The only way this fire could have started is by human hands coming into contact with an ignitable liquid and an open flame to start this fire.” His report also stated “something [was] poured throughout the length of the hallway and ignited.” On redirect examination, Crawford reiterated that regardless of where the fire was ignited, Shelton would have been burned if he had been standing where Anderson said he had been standing.
 

 ¶ 19. Sharron Jones, a forensic scientist with the Mississippi Crime Laboratory, was accepted by the trial court as an expert in the field of analysis of fire debris and ignitable liquids. Out of six material submissions taken by Crawford at the scene, gasoline was identified on three: two samples from a rug near the carport door, and one sample from a carpet pad from beside the couch on the edge of the hallway and living room. Jones also testified that while a test of Anderson’s pajamas did not show ignitable liquids, it would not surprise her if gasoline was smelled on him, because the nose is better at picking up that smell than testing instruments.
 

 ¶ 20. Gary Jones, a senior fire investigator with Crawford Investigation Services
 
 [1]
 
 at the time of the fire, was accepted as an expert in the field of causation and origins of fire. Jones was sent by Nationwide Insurance to investigate the fire. It was his opinion that the fire was incendiary. During his investigation of the scene
 
 *1021
 
 on April 25, 2003, he could smell gasoline near the couch in the living room. He testified that the “irregular burn pattern extended southward down the hallway into the living room and terminated at the rug at the back door.... It is a continuous pattern” from the back door down the hallway. It was also Jones’s opinion that Anderson’s version of the events was not supported by the physical evidence. Jones testified that if a person were standing in the pour pattern of the gasoline, he was going to be burned, because “that liquid pattern is going to support that flame from one end of that space to the other. An individual that’s standing in the middle of it, near it, is going to receive burn exposure effects from it.” Jones’s report of the fire was entered into evidence. It also referenced a previous fire loss by Anderson to a residence he had owned.
 

 ¶ 21. Prior to the trial, Anderson filed a motion in limine, which the trial court granted, to exclude any evidence or reference to this previous fire loss reported by Anderson. During deliberations, the jury asked if they could use the information in Jones’s report that referenced this previous fire loss by Anderson. The trial court responded: “It was determined that this evidence has no evidentiary value and is not for consideration in this matter.” The jury found Anderson guilty of arson. The trial court denied Anderson’s post-trial motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. Anderson timely appeals his conviction and sentence.
 

 ANALYSIS OF THE ISSUES
 

 1. Sufficiency and Weight of the Evidence
 

 ¶ 22. Anderson claims that the jury verdict was against the sufficiency and weight of the evidence. A motion for a directed verdict and a JNOV challenges the sufficiency of the evidence.
 
 Bush v. State,
 
 895 So.2d 836, 843 (¶ 16) (Miss.2005). “[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
 
 Id.
 
 (quoting
 
 Jackson v. Virginia,
 
 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The evidence will be deemed sufficient if “reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense.”
 
 Id.
 
 (quoting
 
 Edwards v. State,
 
 469 So.2d 68, 70 (Miss.1985)). However, if the evidence “point[s] in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” this Court must reverse and render.
 
 Id.
 
 All credible evidence supporting the defendant’s guilt will be accepted as true, and the evidence will be considered in the light most favorable to the State.
 
 McClain v. State,
 
 625 So.2d 774, 778 (Miss.1993).
 

 ¶ 23. On the other hand, a motion for a new trial challenges the weight of the evidence.
 
 Bush,
 
 895 So.2d at 844 (¶ 18). A trial court’s denial of a motion for a new trial is reviewed for an abuse of discretion.
 
 Id.
 
 The reviewing court will disturb a verdict only “when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Id.
 
 All “evidence consistent with the defendant’s guilt is accepted as true together with any reasonable inferences that may be drawn from that evidence.”
 
 Young v. State,
 
 891 So.2d 813, 821 (¶ 21) (Miss.2005) (citing
 
 Heidel v. State,
 
 587 So.2d 835, 838 (Miss.1991)). Finally, “[a]ny factual disputes are properly resolved by the jury and do not mandate a new trial.”
 
 Moore v. State,
 
 859
 
 *1022
 
 So.2d 379, 385 (¶ 26) (Miss.2003) (quoting
 
 McNeal v. State,
 
 617 So.2d 999, 1009 (Miss.1993)).
 

 ¶ 24. In reviewing the record and analyzing the evidence in the light most favorable to the State, we find sufficient evidence was presented to the jury to convict Anderson of arson. The jury was instructed on the elements of arson of a dwelling: that Anderson willfully and maliciously set fire to or caused his dwelling house to be burned. Additionally, a circumstantial-evidence instruction was given to the jury: that the evidence must be so strong as to exclude every other reasonable hypothesis other than of guilt.
 

 ¶ 25. The fact arson was committed was undisputed; the only question was who did it — Anderson or Shelton. The State provided sufficient proof to convict Anderson. Gas was not detected on Shelton, but three people — Megan, Debra, and Courtney— smelled it on Anderson. The State’s expert witnesses all testified that the fire could not have been started as Anderson stated, and Shelton would have been badly burned, but he was not. Anderson, in his brief, re-analyzes the evidence and speculates as to where Shelton could have been standing and not been burned while starting the fire, offering a “reasonable hypothesis” as to Shelton’s possible motive for arson. However, it is ultimately the jury that resolves these matters and any conflicts in the evidence. Anderson had a motive for arson as well, and the evidence showed he lured Shelton to his home in order to purchase tapes of his wife having an affair.
 

 ¶ 26. Further, we do not find the trial court abused its discretion in denying Anderson’s motion for a new trial. The jury chose not to believe Anderson’s version of the events. The weight of the evidence is not so contrary to the verdict that allowing this judgment to stand would sanction an unconscionable injustice. Accordingly, the trial court did not err in denying Anderson’s motion for a JNOV or, alternatively, a new trial.
 

 2. Ineffective Assistance of Counsel
 

 ¶ 27. Anderson argues that his trial counsel was ineffective for several reasons. First, Anderson claims that at trial, his counsel was deficient for failing to renew his objection or make a motion to strike certain parts of Crawford’s testimony on direct examination about where the fire was ignited and where Anderson said Shelton was standing. Anderson contends Crawford improperly referenced a prejudicial un-Mirandized statement made by Anderson to Crawford. Second, in a related contention, Anderson argues that his trial counsel was ineffective for having Crawford read his case summary to the jury, which made a brief reference to this allegedly un-Mirandized statement by Anderson. Third, Anderson states that trial counsel was ineffective for stipulating to the admission of Jones’s investigative report, which referenced a previous residential fire loss by Anderson.
 

 ¶ 28. The Mississippi Supreme Court has held that we may determine the merits of an ineffective-assistance-of-counsel claim on direct appeal even if it was not raised before the trial court.
 
 Read v. State,
 
 430 So.2d 832, 841 (Miss.1983). Usually, because the record on direct appeal is insufficient to support a claim for ineffective assistance of counsel, it is best that these claims be brought in post-eon-viction-relief proceedings.
 
 Id.
 
 at 837. However, the reviewing court “may address an ineffectiveness claim on direct appeal if the presented issues are based on facts fully apparent from the record.”
 
 Archer v. State,
 
 986 So.2d 951, 955 (¶ 16) (Miss.2008) (citing M.R.A.P. 22(b)). We find such a situation here. Due to the
 
 *1023
 
 Anderson’s specific claims of ineffectiveness, we are able to discern from the record whether defendant’s trial counsel was constitutionally effective without reference to materials outside of the record which would necessitate the issue be more appropriately taken up in post-conviction-relief proceedings.
 

 ¶ 29. To succeed on an ineffective-assistance-of-counsel claim, the defendant must prove: (1) counsel’s performance was deficient, and (2) the deficiency prejudiced the defense.
 
 Liddell v. State,
 
 7 So.3d 217, 219 (¶ 6) (Miss.2009) (quoting
 
 Strickland v. Washington,
 
 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Counsel’s errors must be deemed so serious as to deprive the defendant of a fair trial.
 
 Id.
 
 “[A]n appellate court must strongly presume that counsel’s conduct falls within a wide range of reasonable professional assistance, and the challenged act or omission might be considered sound trial strategy. In other words, defense counsel is presumed competent.”
 
 Id.
 
 at 219-220 (¶ 6) (quoting
 
 Bennett v. State,
 
 990 So.2d 155, 158 (¶ 9) (Miss.2008)). In assessing attorney conduct, every effort must be made “to eliminate the distorting effects of hindsight ... and to evaluate the conduct from counsel’s perspective at the time.” In order to reach ineffective assistance of counsel on direct appeal, the record must show that counsel’s performance was so deficient “that the trial judge had a duty to declare a mistrial in order to prevent a mockery of justice.”
 
 Colenburg v. State,
 
 735 So.2d 1099, 1102 (¶ 8) (Miss.Ct.App.1999) (citing
 
 Parham v. State,
 
 229 So.2d 582, 583 (Miss.1969)).
 

 A. Crawford’s Case Summary
 

 ¶ 30. Regarding Anderson’s first claim of ineffective counsel, Crawford testified that, according to the burn patterns, the fire was ignited near Anderson’s bedroom. The State then asked Crawford if Anderson had indicated in his statement that Shelton was standing in the hallway. Defense counsel promptly objected to any reference to a statement Crawford took from Anderson without being Mirandized. Anderson did admit, in his statement to Deputy Steele after he was Mirandized and which was admitted into evidence, that he saw Shelton standing “at the other end of the hallway.” The trial judge ruled that Crawford could refer to Anderson’s statement to Deputy Steele that was already in evidence. Crawford proceeded to testify that Shelton would have been burned badly if he had been standing in the hallway and lit the fire. Crawford then testified that, based on his diagram of the house, where Anderson reported that Shelton had been standing, and the position of the burn pattern, Shelton would have been “right around the center down the hallway.”
 

 ¶ 31. Anderson, however, maintains that Crawford is referencing and basing his opinion not on Anderson’s Mirandized statement to Deputy Steele, but on a supposedly un-Mirandized statement that Crawford refers to in his case summary, which was entered into evidence later in the trial during Crawford’s cross-examination. In the summary, Crawford states he returned to the Lamar County Jail on April 20 to get information from Anderson about the fire. Crawford asked Anderson where Shelton was standing when the fire was set, and he stated that Shelton was standing “in the living room area of the home behind the couch looking toward the bedroom,” which would not have been at the “end of the hallway,” but in the middle of the hallway.
 

 ¶ 32. Anderson’s argument on this point lacks merit. It is not at all clear from the record, as Anderson maintains, that Crawford was referencing Anderson’s statement in the case summary, or that all of the State’s experts based their opinion on this
 
 *1024
 
 statement, and not Anderson’s statement to Deputy Steele. Both statements make reference to Shelton standing in the hall. Moreover, the decision to “ ‘make certain objections fall[s] within the ambit of trial strategy’ and cannot give rise to an ineffective assistance of counsel claim.”
 
 Jackson v. State,
 
 815 So.2d 1196, 1200 (¶ 8) (Miss.2002) (quoting
 
 Cole v. State,
 
 666 So.2d 767, 777 (Miss.1995)). Trial counsel did promptly object when he thought the State was going to refer to the un-Miran-dized statement that had not been recorded. His performance was not deficient in this regard.
 

 ¶ 38. Nor can we say that the statement Crawford references was taken in violation of Anderson’s
 
 Miranda
 
 rights. Anderson relatedly complains that his trial counsel should not have entered the case summary into evidence during his cross-examination of Crawford because “[t]he statement was clearly taken in violation of Anderson’s
 
 Miranda
 
 rights.”
 

 ¶ 34. Anderson acknowledged that he had received his
 
 Miranda
 
 warning and signed a waiver-of-rights form on April 20, 2003, at 1:30 a.m. His statement to Deputy Steele was taken at this time. It is unclear from Crawford’s case summary exactly what time Crawford took this unrecorded statement while Anderson was in custody, but it was sometime on April 20, the same day Anderson waived his
 
 Miranda
 
 rights for the statement to Deputy Steele, and no more than twenty-four hours after he had waived his rights. Crawford admits that he did not re-issue
 
 Miranda
 
 warnings to Anderson during his questioning April 20. Also, Crawford’s case summary notes Anderson had an attorney on April 21, who had advised him not to sign anything further. There is no indication in the record that Anderson had invoked his right to remain silent or requested an attorney until April 21.
 

 ¶ 35. Regarding
 
 Miranda
 
 warnings and a waiver of those rights:
 

 There is no mechanical rule for measuring the longest possible interval between the last warning and the accused’s statement. ... An accused need not be continually reminded of his or her rights once the accused has knowingly waived them, except where necessary to assure that a continuation of the waiver constitutes a knowing and intelligent abandonment of rights.... The accused need not invariably receive new warnings simply because there is ... a resumption of interrogation, [or] an interrogation by a different officer.... Once the mandate of
 
 Miranda
 
 is complied with at the threshold of the interrogation by law enforcement officers, the warning need not be repeated at the beginning of each successive interview.
 

 23 C.J.S.
 
 Criminal Law
 
 § 1264 (2006).
 
 See also United States v. Anthony,
 
 474 F.2d 770, 773 (5th Cir.1973) (holding that repeated warnings are not necessary to a finding that a defendant, with full knowledge of his rights, knowingly and intelligently waived them).
 

 ¶ 36. Generally, a warning given many hours before the making of incriminating statements is not considered “stale” when the subject has been in continuous custody up to the time of the statement, and most courts allow the use of statements taken many hours or even days after the giving of
 
 Miranda
 
 warnings. William E. Ringel,
 
 Searches and Seizures Arrests and Confessions,
 
 § 26:6 (2d ed.2003).
 
 See Biddy v. Diamond,
 
 516 F.2d 118, 122 (5th Cir.1975) (found to have still waived rights even after twelve days passed between initial
 
 Miranda
 
 rights and later questioning where suspect was asked if she remembered her rights);
 
 Maguire v. United States,
 
 396 F.2d 327, 331 (9th Cir. 1968) (could not claim a lack of apprisal of
 
 *1025
 

 Miranda
 
 rights when questioned by another officer three days after the initial
 
 Miranda
 
 warnings and questioning). Accordingly, we cannot say from the record before us that Anderson’s statement that Crawford references in the case summary is un-Mirandized. It was taken within at least one day of Anderson’s acknowledgment and waiver of his rights.
 

 ¶ 87. On cross-examination, defense counsel also requested Crawford’s entire case summary be read to the jury and entered into evidence. Anderson contends this was constitutionally ineffective as well, for the statement contained other prejudicial and inadmissible hearsay statements, but he does not offer any further specifics. We find no merit to these contentions. Crawford’s case summary merely relates Crawford’s actions from his arrival at the scene on April 20 to his investigation on April 21 and his subsequent opinion about the fire, which, in his opinion, was incendiary. Crawford recounts whom he spoke with and what he observed inside the house after the fire. It is quite plausible Anderson’s trial counsel entered the case summary into evidence in order to show that Shelton lit the fire. This Court has stated “only under exceptional circumstances will we second guess counsel on matters of trial strategy.”
 
 Jones v. State,
 
 40 So.3d 665, 668 (¶ 11) (Miss.Ct.App.2010) (citing
 
 Shorter v. State,
 
 946 So.2d 815, 819 (¶ 15) (Miss.Ct.App.2007)). We shall not do so here.
 

 B. Jones’s Report
 

 ¶ 38. Anderson also argues that his trial counsel was deficient for stipulating to the admission of fire investigator Jones’s report, which contained language about a previous residential fire loss by Anderson. In a pretrial-motion hearing, several motions in limine were presented. The trial court granted Anderson’s motion in limine to exclude inferences to any previous fire losses by Anderson. The parties also reached an agreement as to which exhibits from the first trial would be used, any new exhibits, and supposedly eliminated any exhibits precluded by the motion in limine. Of 163 exhibits from Anderson’s murder trial, approximately seventy-six were used in the arson trial. Jones’s report for Crawford Investigation Services, dated May 2003, was nine-written pages, with twenty-three pages containing forty-five photographs of Anderson’s burned residence. The language at issue occurred on page three, and it stated: “Deputy Joe Crawford also advised that Charles Anderson had a previous fire loss while he resided in Columbia. He could not recall the particulars but was going to check with the fire chief about securing a copy of that incident.”
 

 ¶ 39. During deliberations, the jury did pass a question to the trial judge concerning this evidence, and it asked: “can we use information in the Crawford Investigative Report that refers to a previous fire loss by Charles Anderson in Columbia ... ?” The trial court responded, stating: “It was determined that this evidence has no evidentiary value and is not for consideration in this matter.”
 

 ¶40. Anderson argues that this evidence is inadmissible under Mississippi Rules of Evidence 403 and 404(b). Under Rule 403, he claims the prejudicial effect outweighs any probative value. Under Rule 404(b), Anderson states this evidence is inadmissible as a previous crime, wrong, or act “to prove the character of a person in order to show that he acted in conformity therewith.” We do not find Jones’s report in its entirety was inadmissible evidence.
 

 ¶41. Neither do we find Anderson’s trial counsel was constitutionally deficient for failing to redact these two sentences in
 
 *1026
 
 Jones’s report. Even though the jury-asked about this information, they were properly instructed by the trial judge to disregard the previous fire loss. We cannot say that the jury was so impressed with this evidence, as Anderson argues, that it caused his conviction. This issue is without merit.
 

 ¶ 42. We conclude that the record does not indicate that Anderson’s trial counsel was constitutionally ineffective at any point in the proceedings.
 

 3. Prosecutorial Misconduct and Right to a Fair Trial
 

 ¶ 43. Lastly, Anderson argues that he was denied his fundamental rights to due process and a fair trial because of prosecutorial misconduct. Anderson claims the State’s use of prejudicial evidence that had been previously ruled inadmissible evinces a purposeful trial tactic to inflame the jury. Specifically, he refers to the previously discussed incidents of Crawford’s reference to Anderson’s allegedly un-Mirandized statement, as well as the report which mentioned Anderson’s previous fire loss. When presented with an allegation of prosecutorial misconduct, this Court will only reverse if such conduct “endangers the fairness of a trial and the impartial administration of justice.”
 
 Jackson v. State,
 
 1 So.3d 921, 928 (¶ 19) (Miss.Ct.App.2008) (quoting
 
 Goodin v. State,
 
 787 So.2d 639, 653 (¶ 41) (Miss.2001)).
 

 ¶ 44. We find no such instances here. Defense counsel objected to the prosecution’s possible attempt to reference Anderson’s comment in Crawford’s statement, and the trial judge ruled Crawford could refer to Anderson’s statement, which was already in evidence. We find no evidence that the prosecutor purposefully elicited testimony from Crawford in disregard of this ruling. Moreover, both parties stipulated to the admission of Jones’s report into evidence. While the lengthy report did include two sentences about a previous fee loss of Anderson’s, which was to have been excluded from the evidence, we find no indication the State agreed to its admission to inflame the jury. When the jury asked about the previous fire loss during deliberations, the trial judge instructed the jury to disregard it. Jurors are presumed to follow the instructions given by the court.
 
 Harris v. State,
 
 37 So.3d 1237, 1247 (¶ 37) (Miss.Ct.App.2010) (citing
 
 Payne v. State,
 
 462 So.2d 902, 904 (Miss.1984)). We find this issue without merit.
 

 CONCLUSION
 

 ¶ 45. Anderson’s conviction for arson was not against the sufficiency and weight of the evidence. Nor is there any proof in the record that defense counsel was constitutionally ineffective. Any allegations of prosecutorial misconduct are unfounded. Accordingly, we affirm Anderson’s conviction and sentence.
 

 ¶ 46. THE JUDGMENT OF THE CIRCUIT COURT OF LAMAR COUNTY OF CONVICTION OF COUNT II, ARSON, AND SENTENCE OF TWENTY YEARS, WITH THE SENTENCE TO RUN CONSECUTIVELY TO A PREVIOUSLY IMPOSED SENTENCE, IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND TO PAY RESTITUTION OF $136,391, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LAMAR COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . The company has no relation to Crawford with the State Fire Marshal’s office.