IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31699-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JASON MATTHEW GILES, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — During the course of consecutive shopliftings, Jason Giles

threatened the use and used a knife to escape capture. The State of Washington charged

Giles with first degree robbery for the first theft, and second degree robbery, first degree

assault, and third degree assault for the second theft. Through bifurcated proceedings,

juries found Jason Giles guilty as charged. The trial court sentenced him to prison for life

without parole under the persistent offender statute.

On appeal, Jason Giles contends: (1) the trial court violated the right to a public

trial when it allowed for-cause challenges at sidebar and peremptory challenges by

written notes, (2) insufficient evidence supports many of his convictions, (3) the trial

court's instructions impermissibly lowered the State's burden of proof through use of the

phrase "abiding belief in the truth of the charge," (4) his sentence under Washington's Persistent Offender Accountability Act (POAA) to life without the possibility of parole (a) constitutes unconstitutionally cruel punishment, (b) violates his right to a jury because the court found his prior strikes by only a preponderance of the evidence, and (c) violates his right to equal protection because the classification of a persistent offender finding as a "sentencing factor" unconstitutionally lowers the burden to less than beyond a reasonable doubt, and (5) the trial court imposed discretionary legal financial obligations (LFOs) without any evidence of his present or future ability to pay those costs. We affirm Jason Giles' convictions and sentence.

## FACTS

Jason Giles stole a pair of shoes from a Champs athletics store on December 6, 2011, and attempted to steal a security system and other merchandise from a Costco store the next day. Juries heard the following evidence.

On the evening of December 6, 2011, Jason Giles drove his girlfriend's truck to NorthTown mall in Spokane. As he approached the mall's parking garage, the vehicle ran out of gas. Champs Sports store employee Christian Riding helped Giles push the truck into the parking garage. Giles asked Riding for gas money. Riding gave the change laying in his car to Giles. Riding went to work at Champs in the mall, but no good deed goes unpunished.

Jason Giles later entered the Champs store and tried on shoes. Riding recognized

2

Giles from the parking garage. Based on Giles' request for gas money, Riding surmised that Giles might lack funds needed to purchase shoes. Riding told his coworkers to observe Giles.

After 25 minutes of trying on shoes, Jason Giles stated his intent to purchase the shoes on his feet. Giles, while wearing the unpurchased shoes, proceeded toward the front of the store. Christian Riding and Andrew Hite, another Champs employee, waited at the store's exit. Giles continued past the cash register to the store's exit. Riding asked Giles whether he intended to pay for the shoes, after which Giles brushed past Riding and Hite into the mall.

Andrew Hite chased Jason Giles through the mall, while Christian Riding phoned mall security. Riding then joined the chase. After Giles cornered a pole, Hite ran into the pole and fell to the ground. A Sears store locked its gate, blocking Giles' escape route. Giles retreated in search of another exit, while Riding continued to chase Giles out of Hite's line of sight.

Jason Giles stopped, pulled a knife from his pants pocket, and pointed the four to five inch blade at Christian Riding. Giles told Riding, "Come any closer and I'll gut you." Report of Proceedings (RP) at 142. Riding believed that if he continued to pursue Giles, Giles would probably stab him. Riding stopped the chase and Giles fled the mall.

Christian Riding testified at trial:

> Q. Were you concerned when he did that?

3

> A. Yeah.
> Q. Why is that?
> A. I believe anybody would be, having a knife—a knife pulled on you.

RP at 130.

Andrew Hite described Christian Riding as looking "panicked" following Giles' threat. RP at 150. Champs never recovered the $84.99 shoes taken by Jason Giles.

The next day, Jason Giles and an unidentified female companion pushed a cart through a Spokane Costco. Costco loss prevention specialist Troy Humphrey saw Giles place a security system in the cart. Because that security system had been the target of recent thefts, Humphrey continued to observe Giles and the female. Humphrey espied Giles cover the security system with pillows and then remove the system from its packaging. Giles hid the system's various components in his jacket and other clothing. He similarly shrouded a video game and a pair of gloves in his clothes. Jason Giles and his female colleague proceeded through the registers without purchasing the veiled items.

Troy Humphrey phoned Richard Wolfe, a fellow Costco employee positioned near the store's exit. Wolfe stopped Jason Giles as Giles crossed the store's exit. Wolfe said, "I need to talk to you." RP at 499. Giles attempted to bolt. Wolfe tried to grab Giles by the coat, but Giles wildly swung his arms, knocking Wolfe to the ground. Wolfe reached out and grabbed Giles by the ankles. Troy Humphrey approached the fracas and Giles punched Humphrey in the face. Humphrey and Wolfe succeeded in tackling Giles to the

4

ground, as Giles wriggled out of his jacket. With the weight of Humphrey and Wolfe on top of him, Giles could not breathe. So Giles bit Richard Wolfe hard enough to leave teeth marks through Wolfe's coat. Troy Humphrey asked a third Costco employee, Virgil Wear, to join the fray.

Troy Humphrey testified at trial: "As we struggled with Mr. Giles, I asked Mr. Wear to remove the handcuffs from my back area and place them on Mr. Giles as we gained control of his arms." RP at 472. "As we were able to get Mr. Giles' arms out from underneath him, as I pulled his right hand out from underneath him, he actually produced a lock-blade knife." RP at 472. The blade was open. Humphrey continued:

> Q. Do you recall hearing anything about the knife?
> A. I do.
> Q. And what was that?
> A. Um, actually when I saw the knife, I exclaimed there was knife. And I heard other people saying "knife" as well.
> Q. Okay. And what did you do in response to that?
> A. I immediately just grabbed his right wrist and pinned it down to the concrete and instructed him to let go of the weapon.
> . . . .
> A. Um, as Mr. Giles produced the weapon and after repeated commands to release the weapon, Mr. Giles was uncooperative and attempting to—he—as—as the struggle ensued, he was able to get his hand free a number of times and move the weapon about. And in an effort to remove the weapon from him, I struck him, I think twice, on the right side of the face. And eventually he let go of the weapon. The weapon was removed from the area by a third party.

RP at 473-75.

Jason Giles struck Virgil Wear in the knee with the knife. Wear testified:

5

Q. Okay. And at the time that you were hit, did you see the knife coming at you?

A. Oh, yeah. Yeah, it was pretty scary, because I thought it took my knee out. But it actually—he, the way he came across the ground with it, it slid up under my kneecap. And it—just the handle had taken me pretty good.

RP at 518-19.

Costco customer Thomas Walters also saw Jason Giles open and swing the knife.

Walters testified at trial:

When I walked up with my friend Leonard, there was a commotion and a crowd around and a lot of shouting. And we walked up to see what was going on. And there was a few—seemed like a couple, or a few men on top of another man. And the man was telling them to get off. And they were telling him to relax and put his arms behind his back, to—to stop fighting and struggling and that they would. And that went on for a bit.

And after, he kept fighting and struggling and reached in his pocket and pulled out a knife and opened it and tried to swing at one of the guys who was trying to subdue him. And when he hit the guy with the butt of the knife and the—the man who was hit caught his hand and hit the knife out of his hand. And it slid. I got close and—and asked if they needed help or what was going on and—and when the knife slid out of his hand towards me. So I picked it up and closed it and put it in my pocket so it wouldn't be a part of the issue anymore. And after that, he seemed to give up, like it was his last hope. Um, and they were able to get his hands behind his back and cuff him.

RP at 558. Thomas Walters added:

Q. And in your estimation, based on your memory, was there any possibility that it was opened accidentally?

A. Um, I—I—I mean, that's always a possibility. But I don't think it's likely, because he was trying to swing it at someone and hit someone with it to get away.

RP at 560.

6

Jason Giles hit, but did not cut, Virgil Wear in the knee with the knife. The three Costco employees restrained, cuffed, and escorted Jason Giles to an office, where they awaited the arrival of police.

Jason Giles testified at trial in his own defense. Giles admitted to shoplifting, but denied pulling out a knife or punching Troy Humphrey at the Costco store.

Those involved in the Costco scuffle sustained mild to moderate injuries, all of which healed. Jason Giles sustained a cut on his forehead. Troy Humphrey sustained a small bruise, but declined any medical attention. Richard Wolfe bore bite marks on his forearm, which healed. Virgil Wear iced his knee, but did not require medical attention.

Costco recovered all the merchandise Jason Giles attempted to steal. The goods carried a value of between $264.97 and $288.89.

## PROCEDURE

On December 12, 2011, the State of Washington charged Jason Giles with five counts. For the Champs incident, the State charged Giles with first degree robbery against Christian Riding under the armed with a deadly weapon alternative for that crime. For the Costco incident, the State charged Giles with first degree robbery against Troy Humphrey under the armed with a deadly weapon alternative, first degree assault against Virgil Wear with a deadly weapon other than a firearm, and third degree assault against Richard Wolfe with a deadly weapon other than a firearm. The State also charged Giles with possession of a controlled substance.

7

No. 31699-8-III
*State v. Giles*

On December 13, 2011, the State filed a most serious offense notice, which

informed Jason Giles that he may be sentenced as a persistent offender to life without the

possibility of parole. The trial court bifurcated the proceedings such that the Champs

charge was tried separately from the Costco charges.

On December 10 and 11, 2012, Jason Giles underwent trial for first degree

robbery of a pair of shoes at Champs. During jury selection, the trial court heard for-

cause challenges in a bench conference held outside the presence of the jury. The trial

court entertained peremptory challenges silently by paper. Neither party objected to this

process for preemptory challenges. Each challenge became part of the record.

During the Champs trial, the trial court instructed the jury on the State's burden of

proof and the elements of first degree robbery. Instruction 3 set forth the State's burden:

> The defendant has entered a plea of not guilty. That plea puts in
> issue every element of the each crime charged. The State is the plaintiff
> and has the burden of proving each element of the crime beyond a
> reasonable doubt. The defendant has no burden of proving that a
> reasonable doubt exists as to these elements.
> A defendant is presumed innocent. This presumption continues
> throughout the entire trial unless during your deliberations you find it has
> been overcome by the evidence beyond a reasonable doubt.
> A reasonable doubt is one for which a reason exists and may arise
> from the evidence or lack of evidence. It is such a doubt as would exist in
> the mind of a reasonable person after fully, fairly, and carefully considering
> all of the evidence or lack of evidence. *If, from such consideration, you
> have an abiding belief in the truth of the charge, you are satisfied beyond a
> reasonable doubt.*

Clerk's Papers (CP) at 24 (emphasis added); *see* 11 WASHINGTON PRACTICE:

8

No. 31699-8-III
*State v. Giles*

WASHINGTON PATTERN JURY INSTRUCTIONS § 4.01 (3d ed. 2008) (WPIC). For first

degree robbery, the trial court instructed the jury:

> A person commits the crime of robbery when he or she unlawfully
> and with intent to commit theft thereof takes personal property from the
> person or in the presence of another against that person's will by the use or
> threatened use of immediate force, violence, or fear of injury to that person
> or to that person's property or to the person or property of anyone. A threat
> to use immediate force or violence may be either expressed or implied. The
> force or fear must be used to obtain or retain possession of the property or
> to prevent or overcome resistance to the taking, in either of which case the
> degree of force is immaterial.
>  . . . .
> A person commits the crime of robbery in the first degree when in
> the commission of a robbery or in immediate flight therefrom he or she is
> armed with a deadly weapon.
>  . . . .
> To convict the defendant of the crime of robbery in the first degree,
> each of the following elements of the crime must be proved beyond a
> reasonable doubt:
> (1) That on or about December 6, 2011, the defendant unlawfully
> took personal property from the person or in the presence of another;
> (2) That the defendant intended to commit theft of the property;
> (3) That the *taking* was against the person's will by the defendant's
> use or threatened use of immediate force, violence or fear of injury to that
> person or to the person or property of another;
> (4) That force or fear was used by the defendant to obtain or retain
> possession of the property or to prevent or overcome resistance to the
> taking;
> (5) That in the commission of these acts or in immediate flight
> therefrom the defendant was armed with a deadly weapon; and
> (6) That any of these acts occurred in the State of Washington.

CP at 26-28 (emphasis added). The court also instructed the jury on the lesser alternative

crimes of second degree robbery and third degree theft.

The jury found Jason Giles guilty as charged of first degree robbery. The jury

9

further found by special verdict that Giles was armed with a deadly weapon when he committed that crime.

On April 15, 2013, Jason Giles proceeded to trial on charges II through IV, charges incident to the Costco shoplifting. Before trial, the State dismissed count V, the possession of a controlled substance charge. Jury selection and challenges to venire persons proceeded in the same manner as it did in the earlier trial. After resting its case, the State moved to amend count II from first degree robbery to second degree robbery. The trial court granted the motion.

At the close of the second trial, the court provided the jury the same "abiding belief in the truth of the charge" instruction given in the first trial. For second degree robbery, the trial court instructed the jury:

> A person commits the crime of robbery in the second degree as charged in Count [II] when he or she commits robbery.
>  . . . .
> A person commits the crime of robbery when he or she unlawfully and with intent to commit theft thereof takes personal property from the person or in the presence of another against that person's will by the use or threatened use of immediate force, violence, or fear of injury to that person or to that person's property or to the person or property of anyone. A threat to use immediate force or violence may be either expressed or implied. The force or fear must be used to obtain or retain possession of the property or to prevent or overcome resistance to the taking, in either of which case the degree of force is immaterial.
>  . . . .
> To convict the defendant of the crime of robbery in the second degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about December 7, 2011, the defendant unlawfully

took personal property from the person, or in the presence, of another - Troy Humphrey;
(2) That the defendant intended to commit theft of the property;
(3) That the *taking* was against that person's will by the defendant's use or threatened use of immediate force, violence, or fear of injury to that person or to the person or property of another;
(4) That force or fear was used by the defendant to obtain or retain possession of the property or to prevent or overcome resistance to the taking; and
(5) That any of these acts occurred in the State of Washington.

CP at 82-84 (emphasis added). For count II, the court also instructed the jury on the

lesser alternative crime of third degree theft.

For first degree assault, the trial court instructed the second jury:

A person commits the crime of assault in the first degree as charged in Count [III] when, with intent to inflict great bodily harm, he or she assaults another and inflicts great bodily harm or assaults another with a deadly weapon.
. . . .
To convict the defendant of the crime of assault in the first degree, each of the following four elements of the crime must be proved beyond a reasonable doubt:
(1) That on or about the 7th day of December, 2011, the defendant assaulted Virgil Wear;
(2) That the defendant acted with intent to inflict *great bodily harm*;
(3) That the assault was committed with a *deadly weapon*; and
(4) That the acts occurred in the State of Washington.
. . . .
An assault is an intentional touching or striking or cutting of another person, with unlawful force, that is harmful or offensive regardless of whether any physical injury is done to the person. A touching or striking or cutting is offensive if the touching or striking or cutting would offend an ordinary person who is not unduly sensitive.
An assault is also an act, with unlawful force, done with intent to inflict bodily injury upon another, tending but failing to accomplish it and accompanied with the apparent present ability to inflict the bodily injury if

11

not prevented. It is not necessary that bodily injury be inflicted.

An assault is also an act, with unlawful force, done with the intent to create in another apprehension and fear of bodily injury, and which in fact creates in another a reasonable apprehension and imminent fear of bodily injury even though the actor did not actually intend to inflict bodily injury.

. . . .

Bodily injury, physical injury, or bodily harm means physical pain or injury, illness, or an impairment of physical condition.

. . . .

*Great bodily harm* means bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.

. . . .

*Deadly weapon* means any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used is readily capable of causing, death or substantial bodily harm.

CP 89-94 (emphasis added). For count III, the court also instructed the jury on the lesser alternative crime of second degree assault.

The second jury found Jason Giles guilty as charged of second degree robbery, first degree assault, and third degree assault. By special verdict, the jury also found that Giles was armed with a deadly weapon when he committed the three crimes.

On May 8, 2013, the trial court sentenced Jason Giles under Washington's Persistent Offender Accountability Act, a three strikes law. The State provided certified copies of judgments for two prior most serious offenses unrelated to the Champs or Costco stores charges. Jason Giles' first strike was a 1999 conviction for first degree robbery, a class A felony. Giles' judgment and sentence for that felony indicated that, in

12

committing the 1999 robbery or in immediate flight therefrom, Jason Giles inflicted "bodily injury." Giles' second strike was a 2009 conviction for second degree assault, a class B felony. Giles' judgment and sentence for that assault indicated that he assaulted "another with a deadly weapon."

Numerous supporters attended the sentencing hearing to speak on Jason Giles' behalf. The trial court asked that only three speak. Giles' father, Giles' girlfriend of twelve years, and a family friend spoke. Giles' father described him as a hard worker who never received the drug treatment he needed. Giles' girlfriend described him as a loving, hardworking person who helped care for her parents through chronic illness. She told how Jason Giles turned to drugs after she miscarried a few years earlier. Jason Giles' family friend told the court that Giles "could be and would be a good, productive member of society." RP at 644. All three expressed their continued support and love for Jason Giles.

The trial court expressed its difficulty imposing a life sentence, declaring:

> All right. Well, you know, I've heard the word "leniency" used here a couple times. And this is one of those situations where it's very difficult to—you know, it's a very, very difficult sentence for me to give. And I want you to understand that.
> I truly do understand what drugs can do to someone. I truly do. And I see people, thousands of people coming through here who likely wouldn't be here except for that fact. And the pull of the drugs and what they make you do, I understand that completely.
> The legislature has written the rules, however. And they, I suppose, were of the—of the mind when they passed the three-strikes law that there are some individuals in society that are too dangerous to remain in society.

13

That doesn't take into account who people really are. And so I want you to understand that I have to give you this sentence. I have to give you the sentence that's required by law. And you've got two prior strike offenses, and with your third, the only option is life in prison without the possibility of parole. And that's what I have to do. As a judge, that's what I sentence you to. As a human being, I have to tell you, you can't give up hope.

RP at 645-66.

The trial court sentenced Jason Giles to a lifetime of incarceration without parole for first degree robbery, second degree robbery, and first degree assault, and 55 months' confinement for third degree assault. Among other fees, the court imposed $200 in court costs and ordered Giles start paying $5 per month toward costs beginning January 2014. Giles did not object to the imposition of costs, nor did the trial court find that Giles had the present or future ability to pay those costs. At the time of sentencing, Jason Giles was 34 years old.

## LAW AND ANALYSIS

### Public Trial Rights

Jason Giles contends the trial court violated his, and the public's, right to a public trial when it allowed for-cause challenges at sidebar and peremptory challenges by written notes. This court, Division III, recently approved similar processes in *State v. Love*, 176 Wn. App. 911, 309 P.3d 1209 (2013). Division II likewise approved the process, adopting the reasoning of *Love*, in *State v. Dunn*, 180 Wn. App. 570, 321 P.3d

14

1283 (2014). Finally, the state high court recently approved sidebar conferences. *State v. Smith*, ___ Wn.2d ___, 334 P.3d 1049 (2014).

The United State Constitution's Sixth Amendment, applicable to the states through the Fourteenth Amendment due process clause, directs, in relevant part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." *In re Oliver*, 333 U.S. 257, 273, 68 S. Ct. 499, 92 L. Ed. 682 (1948). Washington's Constitution contains two corollary provisions. Article I, section 10 of the Washington Constitution reads, "Justice in all cases shall be administered openly and without unnecessary delay." This provision entitles the public and the press, as representatives of the public, to openly administer justice. *Allied Daily Newspapers of Wash. v. Eikenberry*, 121 Wn.2d 205, 209, 848 P.2d 1258 (1993); *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d 801 (1975). Article I, section 22 of the Washington Constitution provides, in pertinent part, "In criminal prosecutions the accused shall have the right . . . to have a speedy public trial." The constitutional principles arise from the guarantee of open judicial proceedings being a fundamental part of Anglo-American jurisprudence since the common law. *Richmond Newspapers, Inc. v. Commonwealth of Va.*, 448 U.S. 555, 573 n.9, 100 S. Ct. 2814, 65 L. Ed. 2d 973 (1980); *Federated Publ'ns, Inc. v. Kurtz*, 94 Wn.2d 51, 65, 615 P.2d 440 (1980) (Utter, C.J., concurring and dissenting). America had a tradition of open criminal trials that preceded drafting of the Bill of Rights. *Seattle Times Co. v. Ishikawa*, 97 Wn.2d 30, 35-36, 640 P.2d 716 (1982).

15

The threshold determination when addressing an alleged violation of the public

trial right is whether the proceeding at issue even implicates the right. *State v. Sublett*,

176 Wn.2d 58, 71, 292 P.3d 715 (2012). In *Sublett*, our Supreme Court adopted a two-

part "experience and logic" test to address this issue: (1) whether the place and process

historically have been open to the press and general public (experience prong); and (2)

whether the public access plays a significant positive role in the functioning of a

particular process in question (logic prong). 176 Wn.2d at 72-73. Both questions must

be answered affirmatively to implicate the public trial right. *Sublett*, 176 Wn.2d at 73;

*Dunn*, 180 Wn. App. at 574-75.

In *State v. Love*, 176 Wn. App. 911 (2013), this division applied the experience

and logic test to conclude that for-cause challenges at sidebar and peremptory challenges

by written notes do not implicate public trial rights. For the experience prong, the *Love*

court concluded "there is no evidence suggesting that historical practices required these

challenges to be made in public." 176 Wn. App. at 918. We wrote:

> Our research discloses one case in which the defense challenged the
> "use of secret—written—peremptory jury challenges." *State v. Thomas*, 16
> Wn. App. 1, 13, 553 P.2d 1357 (1976). Discerning no prejudice to the
> defendant from the process, and noting that the process was used in several
> counties, the court rejected the argument for having "no merit." *Id.*
> Although suggestive that there may have been an "open" peremptory
> challenge process in use in other places, *Thomas* is strong evidence that
> peremptory challenges can be conducted in private.

*Love*, 176 Wn. App. at 918. In explaining the practical underpinnings of the historical

practices discussed in *State v. Thomas*, the *Love* court noted: "Most parties, in fact, would probably rather not have a challenge for cause made in the presence of the juror in case the challenge failed and the juror might serve knowing the identity of a party that had not wanted him or her to serve." 176 Wn. App. at 918. This passage also goes far in establishing the logic prong of the public trial test.

The *Love* court also directly addressed the logic prong. The court noted the purpose of public trial rights as "'to ensure a fair trial, to remind the officers of the court of the importance of their functions, to encourage witnesses to come forward, and to discourage perjury.'" 176 Wn. App. at 919 (quoting *State v. Brightman*, 155 Wn.2d 506, 514, 122 P.3d 150 (2005)). The *Love* court reasoned:

> Those purposes simply are not furthered by a party's actions in exercising a peremptory challenge or in seeking a cause challenge of a potential juror. The first action presents no questions of public oversight, and the second typically presents issues of law for the judge to decide. The written record of these actions—the clerk's written juror record and the court reporter's transcription of the cause challenges at sidebar—satisfies the public's interest in the case and assures that all activities were conducted aboveboard, even if not within public earshot. The alternative is to excuse all jurors from the courtroom while legal arguments take place in public concerning a juror's perceived bias. We do not believe the public trial right requires the use of two rooms in order to facilitate the defendant's challenge to some jurors for cause.

176 Wn. App. at 919-20 (footnote omitted).

Jason Giles cites *State v. Jones*, 175 Wn. App. 87, 98-99, 303 P.3d 1084 (2013) as reaching the opposite conclusion when it wrote "alternate jurors [must] be called in the

17

same manner as deliberating jurors and subject to *for-cause and peremptory challenges in open court.*" (Emphasis added) (discussing LAWS OF 1917, ch. 37, § 1). Nevertheless, *Jones* concerned whether public trial rights extended to the selection of alternate jurors, not whether for-cause and peremptory challenges must be contemporaneously disclosed to the public.

In short, the public trial right does not attach to the exercise of challenges during jury selection. *State v. Dunn*, 180 Wn. App. at 575. "[E]xperience and logic do not suggest that exercising peremptory challenges at the clerk's station implicates the public trial right." *Dunn*, 180 Wn. App. at 575.

As the clerk's minutes for each of Jason Giles' trials show which jurors were excused by which means, there is a record of the challenges available to the public. This record satisfies the reasoning espoused in *Love* and *Dunn*. The process did not violate either the public's or Jason Giles' public trial rights.

## Sufficiency of Evidence

Jason Giles contends insufficient evidence supports his convictions for (a) first degree robbery against Champs employee Christian Riding, (b) second degree robbery against Costco employee Troy Humphrey; and (c) first degree assault against Costco employee Virgil Wears. Evidence is sufficient if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find each element of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980); *see*

18

No. 31699-8-III
*State v. Giles*

*also State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014). Both direct and indirect evidence may support the jury's verdict. *State v. Brooks*, 45 Wn. App. 824, 826, 727 P.2d 988 (1986). This court draws all reasonable inferences in favor of the State. *Witherspoon*, 180 Wn.2d at 883. Only the trier of fact weighs the evidence and judges the credibility of witnesses. *Witherspoon*, 180 Wn.2d at 883.

The jury found Jason Giles guilty of first degree robbery for stealing shoes from Champs in violation of RCW 9A.56.200(1)(a)(i). The statute provides: "A person is guilty of robbery in the first degree if . . . [i]n the commission of a robbery or of immediate flight therefrom, he or she . . . [i]s armed with a deadly weapon."

The trial court instructed the first jury:

> To convict the defendant of the crime of robbery in the first degree, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about December 6, 2011, the defendant unlawfully took personal property from the person or in the presence of another;
> (2) That the defendant intended to commit theft of the property;
> (3) That the *taking* was against the person's will by the defendant's use or threatened use of immediate force, violence or fear of injury to that person or to the person or property of another;
> (4) That force or *fear* was used by the defendant to obtain or retain possession of the property or to prevent or overcome resistance to the taking;
> (5) That in the commission of these acts or in immediate flight therefrom the defendant was armed with a deadly weapon; and
> (6) That any of these acts occurred in the State of Washington.

19

CP at 28 (emphasis added); *accord* WPIC § 37.02, at 667. Giles challenges the sufficiency of the evidence for elements (3) and (4) in the jury instruction. We reject this challenge.

Jason Giles argues the State did not meet its burden for element (3) because Giles only threatened the use of force to retain the shoes, not in *taking* them. The State did not object to this instruction. The law of the case doctrine, Giles argues, thus required the State to prove that Giles threatened force in taking the shoes. *See State v. Hickman*, 135 Wn.2d 97, 101, 954 P.2d 900 (1998). Giles argues that the "taking" was complete prior to any threat of force.

Jason Giles' argument construes the word "taking" too narrowly. The controlling statute, RCW 9A.56.190, reads, in relevant part:

> A person commits robbery when he or she unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone. Such force or fear must be used to obtain *or retain possession of the property, or to prevent or overcome resistance to the taking*; in either of which cases the degree of force is immaterial.

(Emphasis added.) Force to retain possession is sufficient.

Washington follows a transactional approach to robbery. *State v. Johnson*, 155 Wn.2d 609, 610-11, 121 P.3d 91 (2005). The force or threat of force must relate to obtaining or retaining possession. *Johnson*, 155 Wn.2d at 611. "Taking" refers to both aspects of robbery. For first degree robbery under RCW 9A.56.200, one could be "armed

20

with a deadly weapon" either "[i]n the commission of a robbery *or* of immediate flight therefrom." (Emphasis added.) Thus, one may be guilty of robbery if he or she obtains property through threat of force, or retains possession while in immediate flight through threat of force. In either case, the threat of force is part of the taking. *See, e.g.,* *Witherspoon*, 180 Wn.2d at 884-85.

Jason Giles threatened to eviscerate Christian Riding while pointing a knife at him during Giles' flight from Champs. A rational jury could conclude that the taking was against the person's will by the defendant's threatened use of immediate force.

Jason Giles also argues the State did not meet its burden for element (4) of the charge, because the State did not show that Christian Riding *feared* Giles. This argument relies on an incorrect understanding of the law and belies the facts presented at trial.

To determine whether the defendant used intimidation, we use an objective test. We consider whether an ordinary person in the victim's position could reasonably infer a threat of bodily harm from the defendant's acts. *Witherspoon*, 180 Wn.2d at 884. Thus, the State did not need to prove that Christian Riding subjectively experienced fear. But even assuming such a burden, the State met it. Riding testified that Giles' threat "concerned" him, and Andrew Hite described Riding as "panicked" following the incident. RP at 130, 151. In a light most favorable to the State, this evidence shows that Jason Giles caused Christian Riding fear. A reasonable person could infer a threat of

21

bodily harm from Giles pulling a knife and stating, "Come any closer and I'll gut you." RP at 142.

The jury found Jason Giles guilty of second degree robbery at Costco in violation of RCW 9A.56.210, which provides: "A person is guilty of robbery in the second degree if he or she commits robbery." We have already cited the definition of "robbery" contained in RCW 9A.56.190.

The trial court instructed the second jury:

> To convict the defendant of the crime of robbery in the second
> degree, each of the following elements of the crime must be proved beyond
> a reasonable doubt:
> (1) That on or about December 7, 2011, the defendant unlawfully
> took personal property from the person, or in the presence, of another -
> Troy Humphrey;
> (2) That the defendant intended to commit theft of the property;
> (3) That the *taking* was against that person's will by the defendant's
> use or threatened use of immediate force, violence, or fear of injury to that
> person or to the person or property of another;
> (4) That force or fear was used by the defendant to obtain or retain
> possession of the property or to prevent or overcome resistance to the
> taking; and
> (5) That any of these acts occurred in the State of Washington.

CP at 84 (emphasis added); *accord* WPIC § 37.94, at 672.

Jason Giles challenges the sufficiency of the evidence for element (3), again arguing that any taking was complete prior to any use or threatened use of force. We have already rejected this argument. A rational jury could conclude that Jason Giles, while in immediate flight, used force in his attempt to retain possession of the goods he

22

stole from Costco.

The second jury found Jason Giles guilty of first degree assault in violation of RCW 9A.36.011(1)(a), which provides: "A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death." The trial court instructed the jury:

> To convict the defendant of the crime of assault in the first degree, each of the following four elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 7th day of December, 2011, the defendant assaulted Virgil Wear;
> (2) That the defendant acted with *intent to inflict great bodily harm*;
> (3) That the assault was committed with a deadly weapon; and
> (4) That the acts occurred in the State of Washington.
> . . . .
> *Great bodily harm* means bodily injury that creates a probability of death, or that causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.
> . . . .
> *Deadly weapon* means any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used is readily capable of causing, death or substantial bodily harm.

CP at 90, 93-94 (emphasis added); *accord* WPIC § 35.02, at 453; *accord* WPIC § 2.04, at 28; *accord* WPIC § 2.06.01, at 38. Jason Giles challenges the sufficiency of the evidence for element (2), intent to inflict great bodily harm, and element (3), use of a deadly weapon.

23

Under RCW 9A.04.110(4)(c), "Great bodily harm" consists of "a probability of death, . . . significant permanent disfigurement, or . . . significant permanent loss or impairment of the function of any bodily part or organ." Under RCW 9A.08.010(a), "[a] person acts with intent or intentionally when he or she acts with the objective or purpose to accomplish a result which constitutes a crime." Specific intent cannot be presumed, but it can be inferred as a logical probability from all the facts and circumstances of defendant's conduct. *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320 (1994).

Viewed in a light most favorable to the State, including reasonable inferences, the evidence shows that Jason Giles specifically intended to inflict significant permanent loss or impairment of the function of a bodily part or organ. Giles opened the knife as Troy Humphrey and Richard Wolfe attempted to pull Giles arms behind his back. Humphrey testified: "[Giles] was able to get his hand free a number of times and move the weapon about." RP at 474-75. Giles swung the knife at Virgil Wears. Wears saw the knife coming and expected the blow to slice his knee. A jury could reasonably conclude that Jason Giles intended to impair the functioning of Virgil Wear's knee and that Giles intended the impairment to be significant and permanent enough to ensure his escape. Thus, a rational jury could find that Jason Giles intended to inflict great bodily harm.

Jason Giles also argues the State did not meet its burden for element (3) of showing he was armed with a deadly weapon. Objects other than firearms and explosives qualify as deadly weapons only if the State proves, under the circumstances of the case,

24

that the object was "readily capable of causing death or substantial bodily harm." RCW 9A.04.110(6). In turn, "'Substantial bodily harm' means bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part." RCW 9A.04.110(4)(b). Giles argues the State failed to show he possessed the knife in such circumstances that the knife was readily capable of causing substantial bodily harm. We disagree.

RCW 9A.04.110(6) requires more than mere possession of a deadly weapon. *In re Pers. Restraint of Martinez*, 171 Wn.2d 354, 366, 256 P.3d 277 (2011). The jury may conclude the defendant "used" a deadly weapon by the circumstances of a weapon's use, including the intent and ability of the user, the degree of force, the part of the body to which it was applied, and the actual injuries that were inflicted. *State v. Barragan*, 102 Wn. App. 754, 761, 9 P.3d 942 (2000). "Ready capability is determined in relation to surrounding circumstances, with reference to potential substantial bodily harm." *State v. Shilling*, 77 Wn. App. 166, 171, 889 P.2d 948 (1995). "[T]here must be some manifestation of willingness to use the knife before it can be found to be a deadly weapon under RCW 9A.04.110(6)." *State v. Gotcher*, 52 Wn. App. 350, 354, 759 P.2d 1216 (1988).

Jason Giles manifested a ready willingness to use the knife to cause severe injury. Giles swung the open knife at Virgil Wear's knee. While only the knife's handle

25

contacted Wear, causing no real injury, the potential for impairment or a fracture, as RCW 9A.04.110(4)(b) requires, was great. Viewed in a light most favorable to the State, the evidence shows that Giles intended to sufficiently injure Wear, aiming for a vulnerable joint, to ensure escape. A rational jury could find that Jason Giles possessed the knife in such circumstances that the knife was readily capable of causing substantial bodily harm and thus a deadly weapon.

Jury Instruction: Abiding Belief in the Truth of the Charge

Jason Giles contends the trial court's instructions impermissibly lowered the State's burden of proof through use of the phrase "abiding belief in the truth of the charge." CP at 24, 80. We disagree.

Jason Giles is not the first to challenge the "abiding belief" language in a jury instruction. Washington's traditional abiding-belief instruction has been upheld in several appellate cases in which the defendant argued the language diluted the State of Washington's burden of proof. *See State v. Pirtle*, 127 Wn.2d 628, 658, 904 P.2d 245 (1995); *State v. Lane*, 56 Wn. App. 286, 299-300, 786 P.2d 277 (1989); *State v. Mabry*, 51 Wn. App. 24, 25, 751 P.2d 882 (1988); *State v. Price*, 33 Wn. App. 472, 475-76, 655 P.2d 1191 (1982). The U.S. Supreme Court has also upheld the use of traditional abiding-belief instructions. *Victor v. Nebraska*, 511 U.S. 1, 14-15, 114 S. Ct. 1239, 127 L. Ed. 2d 583 (1994).

26

In *State v. Bennett*, 161 Wn.2d 303, 318, 165 P.3d 1241 (2007), our Supreme Court "exercise[d] [its] inherent supervisory power to instruct Washington trial courts to use only the approved pattern instruction WPIC 4.01 to instruct juries that the government has the burden of proving every element of the crime beyond a reasonable doubt." WPIC 4.01 allows optional use of the "abiding belief" language.

Jason Giles cites *State v. Emery* to argue that the abiding belief language is no longer permissible. 174 Wn.2d 741, 278 P.3d 653 (2012). In *Emery*, the prosecution argued in closing: "'Members of the jury, I ask you, go back there to deliberate, consider the evidence, use your life experience and common sense, and speak the truth by holding these men accountable for what they did.'" 174 Wn.2d at 751. Our Supreme Court held: "The jury's job is not to determine the truth of what happened; a jury therefore does not 'speak the truth' or 'declare the truth.' Rather, a jury's job is to determine whether the State has proved the charged offenses beyond a reasonable doubt." *Emery*, 174 Wn.2d at 760 (citation omitted).

*Emery* is inapposite. "Declaring the truth" is different than an "abiding belief in the truth of the charge." Inviting a jury to declare the truth mischaracterizes the jury's role, suggesting that its role is to solve the case. *Emery*, 174 Wn.2d at 760. In contrast, the existence or nonexistence of an "abiding belief" correctly invites the jury to weigh the evidence.

27

Washington's Persistent Offender Accountability Act

Jason Giles contends his sentence under Washington's Persistent Offender Accountability Act (POAA) to life without the possibility of parole (a) constitutes cruel and unusual punishment, (b) violates his right to a jury because the court found his prior strikes by only a preponderance of the evidence, and (c) violates his right to equal protection because the classification of a persistent offender finding as a sentencing factor unconstitutionally lowers the burden to less than beyond a reasonable doubt. We disagree with each contention.

Whenever a sentencing court concludes an offender is a "persistent offender," the court must impose a life sentence, and the offender is not eligible for parole or any form of early release. RCW 9.94A.570. "Persistent offender" is an offender currently being sentenced for a "most serious offense" who also has two or more prior convictions for "most serious offenses." RCW 9.94A.030(37). RCW 9.94A.030(32) lists Washington's "most serious offenses," which include any class A felony, second degree assault, and second degree robbery, among other offenses.

Under the POAA, three of the four convictions at issue in this case—first degree robbery, second degree robbery, and first degree assault—required the court to sentence Jason Giles to life in prison without the possibility of parole. *See* RCW 9.94A.030(32), .555, .570. Each of these three offenses is Jason Giles' third strike, because of earlier convictions.

28

"The Eighth Amendment bars cruel and unusual punishment while article I, section 14 [of the Washington Constitution] bars cruel punishment. This court has held that the state constitutional provision is more protective than the Eighth Amendment in this context." *State v. Witherspoon*, 180 Wn.2d at 887 (citing *State v. Rivers*, 129 Wn.2d 697, 712, 921 P.2d 495 (1996)). "Consequently, if we hold that [a defendant's] life sentence does not violate the more protective state provision, we do not need to further analyze the sentence under the Eighth Amendment." *Witherspoon*, 180 Wn.2d at 887.

To determine whether punishment is cruel under article 1, section 14, this court considers the four factors set forth in *State v. Fain*, 94 Wn.2d 387, 392-93, 617 P.2d 720 (1980). *Witherspoon*, 180 Wn.2d at 887. Those four factors are: "(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction." *Rivers*, 129 Wn.2d at 713.

Second degree robbery is the least culpable of Jason Giles' possible third strikes. But even for second degree robbery, our Supreme Court "has repeatedly held that a life sentence after a conviction for robbery is neither cruel nor cruel and unusual." *Witherspoon*, 180 Wn.2d at 889.

Although we may agree with the trial court's sympathetic comments, *Witherspoon* is dispositive. Alvin Witherspoon was sentenced under POAA to life in prison without the possibility of parole for his committing second degree robbery. *Witherspoon*, 180

29

Wn.2d at 882. As Witherspoon exited a home he had just burgled, Witherspoon encountered the victim of his burglary as she returned home. *Witherspoon*, 180 Wn.2d at 881. Witherspoon held his hand behind his back, and told the victim that he held a pistol.

Our Supreme Court analyzed the *Fain* factors as they pertain to second degree robbery, noting that the nature of the crime of robbery includes the threat of violence against another person. *Witherspoon*, 180 Wn.2d at 888. The purpose of POAA is the segregation of persistent offenders from the rest of society, which also serves as a general deterrence to others. *Witherspoon*, 180 Wn.2d at 888. Although most jurisdictions do not count second degree robbery as a strike offense, most robbery offenses, in Washington, carry with them the sentence of life in prison without the possibility of release when the offender has a history of at least two other similarly serious offenses. *Witherspoon*, 180 Wn.2d at 888. The *Witherspoon* Court concluded: "Considering the four *Fain* factors, Witherspoon's sentence of life in prison without the possibility of release does not violate article I, section 14 of the Washington State Constitution or the Eighth Amendment to the United States Constitution." *Witherspoon*, 180 Wn.2d at 889.

In applying POAA to a particular defendant, *Witherspoon* invites courts to consider a defendant's prior strikes. *Witherspoon*, 180 Wn.2d at 889. In this case, Jason Giles inflicted bodily injury in 1999 when committing first degree robbery and in 2009 when committing second degree assault. Given the violent nature of all three of Jason Giles' strikes, the sentence of life in prison without the possibility of release for this third

30

strike offense is proportionate to the crime, and accords with POAA's purposes. *Witherspoon*, 180 Wn.2d at 889. Jason Giles' punishment of life in prison without the possibility of parole may be severe, but the punishment is not unconstitutional.

Jason Giles also argues that a jury needed to find his prior strike convictions beyond a reasonable doubt. Our Supreme Court addressed this issue in *Witherspoon*, holding: "Neither the federal nor state constitution requires that previous strike offenses be proved to a jury. Furthermore, the proper standard of proof for prior convictions is by a preponderance of the evidence." *Witherspoon*, 180 Wn.2d at 893. The *Witherspoon* court further noted that the best evidence of prior convictions are certified copies of the respective judgments, which the State provided in this case. *Witherspoon*, 180 Wn.2d at 893. Thus, the State met its burden of proving Jason Giles' prior strikes.

Jason Giles asks this court to hold that the trial judge's imposition of a sentence of life without the possibility of parole, based on the court's finding of the necessary facts by a preponderance of the evidence, violated the equal protection clause. He argues that similar convictions and punishments require a jury finding of guilt. Washington courts have already addressed this issue and found no violation of equal protection.

In support of his equal protection argument, Giles urges this court to review the POAA under the strict scrutiny standard. The decided standard is rational basis, however. *State v. Manussier*, 129 Wn.2d 652, 673-74, 921 P.2d 473 (1996). "A statute survives rational basis review if the statute is rationally related to achieve a legitimate

31

state interest and the classification does not rest on grounds that are wholly irrelevant to achieving the state interest." *State v. McKague*, 159 Wn. App. 489, 518, 246 P.3d 558, *aff'd but criticized on other grounds*, 172 Wn.2d 802, 262 P.3d 1225 (2011). "The burden is on the party challenging the classification to show that it is 'purely arbitrary.'" *McKague*, 159 Wn. App. at 518.

Jason Giles emphasizes that a jury must find beyond a reasonable doubt: a prior conviction for a felony sex offense in order to punish a current conviction for communicating with a minor for immoral purposes as a felony, *State v. Roswell*, 165 Wn.2d 186, 192, 196 P.3d 705 (2008); two prior convictions for violation of a no-contact order in order to punish a current conviction for violation of a no-contact order as a felony, *State v. Oster*, 147 Wn.2d 141, 146, 52 P.3d 26 (2002); and four prior DUI convictions in the last 10 years in order to punish a current DUI conviction as a felony, *State v. Chambers*, 157 Wn. App. 465, 475, 237 P.3d 352 (2010). Thus, Giles contends, Washington law has a higher standard for finite increases in incarceration than it does for the imposition of a life sentence under POAA.

This court rejected such an argument in *State v. Williams*, writing:

> The Washington Supreme Court has rejected equal protection arguments under the Persistent Offender Accountability Act (RCW 9.94A.555) that would require the State to submit a defendant's prior convictions to a jury and to prove them beyond a reasonable doubt. *State v. Thiefault*, 160 Wn.2d 409, 418, 158 P.3d 580 (2007). The purposes of the Persistent Offender Accountability Act are the same for two-strike and three-strike offenders: to protect public safety by putting the most

32

dangerous criminals in prison, to reduce the number of serious repeat offenders, to provide simplified sentencing, and to restore the public trust in the criminal justice system.

. . . .

We conclude then that proof of his prior convictions by a preponderance of the evidence is not entirely irrelevant to the purposes of the persistent offender statutes.

156 Wn. App. 482, 498, 234 P.3d 1174 (2010).

As Division One of this court concluded in *State v. Langstead*, "recidivists whose conduct is inherently culpable enough to incur a felony sanction are, as a group, rationally distinguishable from persons whose conduct is felonious only if preceded by a prior conviction for the same or a similar offense." 155 Wn. App. 448, 456-57, 228 P.3d 799 (2010). Because the POAA is rationally related to this distinction, it survives rational basis review.

## Legal Financial Obligations

Jason Giles contends the trial court imposed discretionary legal financial obligations (LFOs) without any evidence of his present or future ability to pay those costs. Courts may impose legal financial obligations, such as court costs, DNA collection fees, and victim restitution, if a defendant has or will have the financial ability to pay them. RCW 10.01.160; RCW 9.94A.760(2); *State v. Curry*, 118 Wn.2d 911, 914-16, 829 P.2d 166 (1992).

Jason Giles failed to object to the legal financial obligations below. Until our Supreme Court decides otherwise, the rule established by each division of this court is

33

No. 31699-8-III
*State v. Giles*

that a defendant may not challenge a determination regarding his or her ability to pay

LFOs for the first time on appeal. *State v. Duncan*, 180 Wn. App. 245, 252, 327 P.3d 699

(2014); *State v. Calvin*, 176 Wn. App. 1, 316 P.3d 496, 507-08, *petition for review filed*,

No. 89518-0 (Wash. Nov. 12, 2013); *State v. Blazina*, 174 Wn. App. 906, 911, 301 P.3d

492, *review granted*, 178 Wn.2d 1010, 311 P.3d 27 (2013). Therefore, we do not reach

Giles' challenge to the trial court's imposition of $200 in discretionary costs.

## CONCLUSION

We affirm the convictions and sentence of Jason Giles.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Lawrence-Berrey, J.

34